931 P.2d 1046

STATE of Arizona, Appellee/Cross–
Appellant,

v.

Shelly Kay MOTT, Appellant/Cross–
Appellee.

No. CR–95–0274–PR.

Supreme Court of Arizona,
En Banc.

Jan. 16, 1997.

Grant Woods, Attorney General by Paul J. McMurdie and Jon G. Anderson, Phoenix, for State of Arizona.

Susan A. Kettlewell, Pima County Public Defender by Frank P. Leto, Tucson, for Shelly Kay Mott.

## OPINION

TOCI, Vice Chief Judge*.

Shelly Kay Mott ("defendant") was convicted of two counts of child abuse and first-

---

* Philip E. Toci, Vice Chief Judge of the Arizona Court of Appeals was designated by the Chief Justice of the Arizona Supreme Court to partici-

pate in this matter pursuant to Ariz. Const. art. VI, § 3.

degree murder. The trial court precluded defendant from introducing expert psychological testimony that as a battered woman, she was unable to form the requisite mental state necessary for the commission of the charged offenses. The court of appeals, division two, relying on *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), and *State v. Gonzales*, 140 Ariz. 349, 681 P.2d 1368 (1984), reversed the trial court and held that the evidence was admissible to challenge an element of the crime. *State v. Mott*, 183 Ariz. 191, 192, 901 P.2d 1221, 1222 (App.1995).

We hold that the proffered evidence was inadmissible as an attempt to prove defendant's diminished capacity. We vacate the court of appeals' opinion. Furthermore, we overrule *Gonzales* to the extent that it permitted evidence of diminished capacity as a defense to the crime charged. Because we reverse the court of appeals, we decide defendant's remaining claims of error and affirm the trial court.

## I. FACTS AND PROCEDURAL BACKGROUND

On January 1, 1991, at approximately 9:00 p.m., defendant left her two young children with her boyfriend, Vincent Near. When she returned home less than an hour later, she found Near standing over her two-and-one-half-year-old daughter, Sheena, fanning her with a towel. Near told defendant that Sheena had fallen off the toilet and hit her head.

At 10:15 p.m., Hank Gnatowsky, a former paramedic, stopped by defendant's home and found Near reading a first aid book and defendant sitting by some child-care pamphlets titled "Your Baby's Safety" and "Your Baby and Crying." Near told Gnatowsky that Sheena had fallen off the toilet. Gnatowsky responded that Sheena should go to a hospital and offered to take her. Near declined the offer, and Gnatowsky went into Sheena's room to check on her. He found that she was having trouble sleeping, her eyes were fluttering, and her hands were moving as if she were dreaming. He spoke to her, but she did not respond. He told defendant twice more before he left that Sheena should be taken to a hospital. Each time, Near refused.

At approximately 8:00 a.m. the next morning, defendant went to the home of a friend, Erin Scott, crying that Sheena would not wake up. Defendant told Scott what had allegedly happened. Scott asked why defendant had not sought help sooner, and defendant replied that she was worried that the authorities would take Sheena from her because of Sheena's bruises. Defendant went home and returned to Scott's with Sheena. Scott noticed that the back of Sheena's head was very soft, there was some bruising on her face, and she was exhibiting spasms. Scott called 911.

Upon Sheena's admission to the hospital, Dr. Richard Lemen diagnosed her as being in cardiopulmonary arrest with extreme trauma, non-accidental. Dr. Lemen found a large hemorrhage in the brain, resulting in the death of the right side of Sheena's brain. Because of the severity of injury, he noted Sheena's chances of survival as hopeless and that the cause was non-accidental. Sheena died January 9.

At trial, Dr. Lemen stated that Sheena's injury could not have resulted from falling off a toilet seat. He also found numerous bruises and abrasions, including cigarette burn marks between Sheena's fingers. Dr. James Dunn, another emergency room physician, testified that Sheena's injury would have required a fall in excess of twelve feet, the equivalent of a major car accident, or repeated blows to Sheena's head with a hard object. Dr. Anna Binkewicz, a pediatrician, found a "branding" burn on the bottom of Sheena's foot, a series of whip marks on her upper thigh and buttocks, and bruising on her head and body.

In an interview with police, defendant admitted that, over the few months before Sheena's death, she had confronted Near five or six times about bruising on Sheena. Defendant said that Near had told her that Sheena had fallen but that she did not believe him. She stated that she had been trying to leave Near because she did not want Sheena to get hurt. She never reported Near's abuse because she did not want him to get in trouble, and she dressed Shee-

na to hide the bruising. Defendant also admitted that she did not take Sheena to the hospital the night of her fatal injury because she did not want anyone to see the bruises.

The Pinal County grand jury indicted defendant on January 9 on two counts of child abuse under circumstances likely to produce death or serious bodily injury, class 2 felonies, and on one count of first-degree murder, a class 1 felony. Defendant disclosed as a defense that she "lacked the capacity to act due to the Battered Woman Syndrome." The state moved to preclude the use of the battered-woman syndrome as a defense, claiming that such a defense was only admissible in self-defense cases in which the victim had battered the defendant. Defendant then filed a motion to admit the testimony of Dr. Cheryl Karp, Ph.D., to prove that defendant was unable to form the requisite intent to have acted knowingly or intentionally.

The trial court initially ordered that Dr. Karp could testify regarding her opinions of defendant's "mental and emotional make-up and capabilities." Upon hearing Dr. Karp testify at trial, however, the trial court found that the testimony regarding the battered-woman syndrome was an attempt to establish a diminished capacity defense. The court ruled the testimony was inadmissible.

On Count Two, based upon the defendant's leaving Sheena with Near, the jury found defendant guilty of the lesser-included offense of child abuse of a person under fifteen under circumstances other than those likely to produce death or serious bodily injury. On Count Three, based on the failure to take Sheena to the hospital, the jury found defendant guilty of knowing or intentional child abuse likely to produce death. On Count Four, felony murder, the jury returned a verdict of guilty.

The trial court sentenced defendant to the presumptive term of four years on Count Two, a mitigated term of twelve years on Count Three, and thirty-five years without possibility of parole for first-degree felo-ny murder. The court ordered sentences on the latter two counts to run concurrently with each other, but consecutively to Count Two. The trial court credited defendant with 389 days of presentence incarceration and ordered her to pay a $300 felony assessment fee.[1] Defendant appealed to the court of appeals.

The court of appeals reversed defendant's conviction, finding that the trial court's preclusion of defendant's proffered testimony regarding battered-woman syndrome violated due process. *State v. Mott,* 183 Ariz. 191, 195, 901 P.2d 1221, 1225 (App.1995). Relying on *Christensen* and *Gonzales,* the court held that Dr. Karp's testimony on the character traits of battered women and the presence of those traits in defendant provided probative evidence that, if believed by the jury, negated the element of knowledge or intent. *Mott,* 183 Ariz. at 194, 901 P.2d at 1224. It found that precluding the testimony denied defendant the opportunity to present essential evidence in her defense. *Id.* at 195, 901 P.2d at 1225. Consequently, the court of appeals reversed and remanded for a new trial. *Id.* The state petitioned for, and we granted, review in this court.

## II. DISCUSSION

### A. Expert Testimony

Defendant offered the expert testimony of Dr. Karp to challenge the element of knowledge or intent on the child abuse counts. Defendant made an offer of proof before trial to the trial court regarding Dr. Karp's testimony. Additionally, the trial court allowed the doctor to testify at the mitigation hearing after the trial to make a further record of the proffered testimony.

Dr. Karp had concluded that defendant was a battered woman and that being a battered woman was relevant to her ability to protect her children. According to the doctor, a battered woman forms a "traumatic bond" to her batterer. She does not feel that

she can escape her environment; she is hopeless and depressed. Furthermore, the battered woman cannot sense danger or protect others from danger. She is inclined to believe what the batterer tells her and will lie to protect him. Dr. Karp concluded that defendant's history of being abused, in conjunction with her limited intelligence,[2] prohibited her from being able to decide to take Sheena to the hospital. Prior to trial, defendant's counsel offered the evidence to "explain to the jury why [defendant] lacked the capacity to defy [Near.]"

■ As a threshold issue, the state claims that defendant has waived any claim of error because she withdrew the battered-woman syndrome defense. Though defendant withdrew the syndrome as a defense, she continued to argue that evidence of the syndrome and her own history of being abused were relevant evidence of her decision-making process and her inability to form the requisite mental state for the charged offenses. Consequently, we find that defendant has not waived her claim that the trial court erred by precluding the proffered testimony.[3]

Defendant's purpose in offering Dr. Karp's testimony was to demonstrate that defendant was not capable of forming the requisite mental state of knowledge or intent.[4] Thus, the evidence of defendant's history of being battered and of her limited intellectual ability was not offered as a defense to excuse her crimes but rather as evidence to negate the *mens rea* element of the crime. Courts have "referred to the use of expert psychiatric evidence to negate mens rea as a 'diminished capacity' or 'diminished responsibility' defense." *United States v. Pohlot*, 827 F.2d

889, 896 (3rd Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988). Such evidence is distinguishable from an affirmative defense that excuses, mitigates, or lessens a defendant's moral culpability due to his psychological impairment. *United States v. Cameron,* 907 F.2d 1051, 1062-63 (11th Cir.1990); *United States v. Fazzini,* 871 F.2d 635, 641 (7th Cir.1989), *cert. denied,* 493 U.S. 1095, 110 S.Ct. 1173, 107 L.Ed.2d 1075 (1990).

The Arizona legislature, however, declined to adopt the defense of diminished capacity when presented with the opportunity to do so. Arizona's criminal code was based on the Model Penal Code. *See State v. Willoughby,* 181 Ariz. 530, 538, 892 P.2d 1319, 1327 (1995). The 1962 version of the Model Penal Code allowed the admission of "[e]vidence that the defendant suffered from a mental disease or defect ... whenever it [wa]s relevant to prove that the defendant did or did not have a state of mind that is an element of the offense." Model Penal Code § 4.02(1) (1962). This section was written in recognition of the existence of "degrees of mental disease or defect that fall short of that required for invoking the defense of irresponsibility, but that may be put in evidence as tending to show that the defendant lacked the specific *mens rea* required for the commission of the offense charged." Model Penal Code and Commentaries § 4.02(1) cmt. 2 (1985). The legislature's decision not to adopt this section of the Model Penal Code evidences its rejection of the use of psychological testimony to challenge the *mens rea* element of a crime.

**2.** At trial, Dr. Karp was permitted to testify at length regarding defendant's limited intellectual abilities. Dr. Karp testified that defendant had a verbal I.Q. of 78, which is on the "borderline mentally defective range of intelligence." Consequently, defendant possessed "extremely limited abilities" and was learning disabled. Dr. Karp further testified that defendant was "concrete." This meant that defendant was unable to make complex decisions or to abstract solutions from one situation to the next.

**3.** Evidence of battered-woman syndrome is ordinarily offered in self-defense cases. It has been used to aid the jury in assessing the reasonableness of the defendant's apprehension and the

imminency of death or serious bodily injury. *Ex Parte Haney,* 603 So.2d 412, 414 (Ala.1992); *State v. Koss,* 49 Ohio St.3d 213, 551 N.E.2d 970, 973 (Oh.1990); *Bechtel v. State,* 840 P.2d 1, 9 (Okla.Crim.App.1992). In this case, however, defendant did not offer the evidence for these purposes and we need not address the admissibility of battered-woman-syndrome evidence in self-defense cases.

**4.** Contrary to one of the dissent's arguments, defendant did offer this evidence in an attempt to demonstrate that she did not have the *capacity* to form the requisite mental state. She made this claim, through her counsel, both at a pretrial hearing and at trial.

Moreover, this court considered and rejected the defense of diminished capacity in *State v. Schantz*, 98 Ariz. 200, 403 P.2d 521 (1965), *cert. denied*, 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 530 (1966). There, we recognized that the legislature is responsible for promulgating the criminal law and that it "has not recognized a disease or defect of mind in which volition does not exist ... as a defense to a prosecution for [a crime.]" *Id.* at 212, 403 P.2d at 529. Furthermore, we found that this Court does not have the authority to adopt the diminished capacity defense. 98 Ariz. at 212–13, 403 P.2d at 529.

■ Because the legislature has not provided for a diminished capacity defense, we have since consistently refused to allow psychiatric testimony to negate specific intent. *State v. Ramos*, 133 Ariz. 4, 6, 648 P.2d 119, 121 (1982); *State v. Laffoon*, 125 Ariz. 484, 486, 610 P.2d 1045, 1047 (1980); *State v. Briggs*, 112 Ariz. 379, 382, 542 P.2d 804, 807 (1975). Instead, the legislature has provided the *M'Naghten* test "as the sole standard for criminal responsibility." *Ramos*, 133 Ariz. at 6, 648 P.2d at 121.[5] This test provides:

> A person is not responsible for criminal conduct by reason of insanity if at the time of such conduct the person was suffering from such a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong.

A.R.S. § 13–502(A). Consequently, Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime.

■ Defendant and the dissent contend, however, that precluding a defendant from introducing psychological testimony to challenge the *mens rea* element of a crime violates due process. The United States Supreme Court addressed this question in *Fisher v. United States*, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). There, the trial court refused to instruct the jury that it could consider the defendant's mental deficiencies, which did not rise to the level of insanity, in determining the elements of premeditation. *Id.* at 470, 66 S.Ct. at 1321–22. The Supreme Court noted that the law of the District of Columbia did not permit such an instruction. *Id.* at 471, 66 S.Ct. at 1322. The Court stated that, contrary to the defendant's request, it would not "force" the District of Columbia to adopt a requirement that criminal defendants be allowed to present evidence of a mental deficiency to determine the elements of premeditation and deliberation. *Id.* at 476, 66 S.Ct. at 1325.

The Court went on to state:

> We express no opinion upon whether the theory for which petitioner contends should or should not be made the law of the District of Columbia. Such a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District. The administration of criminal law in *matters not affected by Constitutional limitations* or a general federal law is peculiarly of local concern.

*Id.* (emphasis added). Thus, *Fisher* stands for the proposition that state legislatures, without violating the constitution, may preclude defendants from offering evidence of mental and psychological deficiencies to challenge the elements of a crime.

More recently, several of the federal circuits have held that "a state is not constitutionally compelled to recognize the doctrine of diminished capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent." *Muench v. Israel*, 715 F.2d 1124, 1144–45 (7th Cir.1983), *cert. denied sub. nom Worthing v. Israel*, 467 U.S. 1228, 104 S.Ct. 2682, 81 L.Ed.2d 878 (1984); *see also Haas v. Abrahamson*, 910 F.2d 384, 398 (7th Cir. 1990); *Welcome v. Blackburn*, 793 F.2d 672, 674 (5th Cir.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 825 (1987);

---

5. Voluntary intoxication negating the culpable mental state of knowledge or intent was at one time an available defense. Ariz.Rev.Stat.Ann. ("A.R.S.") § 13–503 (1989). As of January 2, 1994, however, the legislature has removed it as a "defense for any criminal act or requisite state of mind." A.R.S. § 13–503 (Supp.1995).

*Campbell v. Wainwright,* 738 F.2d 1573, 1581 (11th Cir.1984), *cert. denied,* 475 U.S. 1126, 106 S.Ct. 1652, 90 L.Ed.2d 195 (1986); and *Wahrlich v. Arizona,* 479 F.2d 1137, 1138 (9th Cir.), *cert. denied,* 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973).

The dissent relies on *Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), to argue that precluding a defendant from offering evidence that he was unable to form the requisite intent because of a mental defect is unconstitutional. *Egelhoff,* however, did not address the constitutionality of precluding evidence of diminished capacity to challenge the *mens rea* element of a crime. Instead, it resolved the constitutionality of precluding a defendant from offering evidence of his voluntary intoxication to negate the *mens rea* element of an offense. *Id.* at ——, 116 S.Ct. at 2016. The court concluded that barring such evidence of voluntary intoxication does not violate the constitution. *Id.* at ——, 116 S.Ct. at 2024. Thus, *Egelhoff* lends little support to the dissent's argument. Furthermore, in *Fisher,* the Supreme Court upheld the constitutionality of precluding a defendant from offering psychological testimony to rebut *mens rea.* Until such time as the Court overrules *Fisher,* it resolves the due process issue raised by defendant and the dissent.

■ Additionally, for a state's regulation of its criminal procedures to violate the Due Process Clause, it must "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson v. New York,* 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977) (quoting *Speiser v. Randall,* 357 U.S. 513, 523, 78 S.Ct. 1332, 1340–41, 2 L.Ed.2d 1460 (1958)). The practice of barring defendants from offering diminished capacity evidence to negate the *mens rea* element of a crime does not violate a fundamental principle. To the contrary, as the Supreme Court noted in *Fisher,* requir-

ing states to allow such evidence "would involve a fundamental change in the common law theory of responsibility." 328 U.S. at 476, 66 S.Ct. at 1325; *see also id.* (referring to such a change as "a radical departure from common law concepts"). Furthermore, the fact that many jurisdictions [6] still do not allow the use of diminished capacity evidence to negate *mens rea* is "plainly worthy of considering in determining whether rejection of the doctrine offends due process." *Muench,* 715 F.2d at 1142.

The dissent argues that several federal circuit court cases have considered "the precise issue raised in this case" and have allowed the introduction of evidence rebutting the element of *mens rea.* The cited cases, however, address the question whether the United States Congress intended to abolish the diminished capacity defense by the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17. *See Cameron,* 907 F.2d at 1061; *United States v. Bartlett,* 856 F.2d 1071, 1079–81 (8th Cir.1988); *United States v. Twine,* 853 F.2d 676, 678 (9th Cir.1988); *Pohlot,* 827 F.2d at 897. These cases do not address the *constitutionality* of precluding a defendant from introducing evidence of diminished capacity to challenge the element of specific intent. Consequently, they do not support the dissent's assertion that due process requires Arizona to admit evidence of mental abnormality to negate *mens rea.*

Furthermore, we note in passing that most of the federal courts that explicitly recognize that evidence of mental abnormality is admissible on the issue of *mens rea,* prohibit the type of testimony offered by defendant in this case. *See Pohlot,* 827 F.2d 889; *Cameron,* 907 F.2d 1051; *but see Twine,* 853 F.2d 676 (mental defect evidence admissible on whether defendant possessed mental capacity to form specific intent).

In *Cameron,* the defendant claimed that schizophrenia " 'rendered her incapable of

---

6. *Bates v. State,* 386 A.2d 1139, 1143–44 (Del. 1978); *Chestnut v. State,* 538 So.2d 820 (Fla. 1989); *Dennis v. State,* 170 Ga.App. 630, 317 S.E.2d 874, 876 (1984); *Cardine v. State,* 475 N.E.2d 696, 698 (Ind.1985); *State v. Thompson,* 665 So.2d 643, 647 (La.App.1995); *State v. Bouwman,* 328 N.W.2d 703, 704–05 (Minn.1982); *State v. McCray,* 103 Ohio App.3d 109, 658 N.E.2d 1076, 1082 (1995); *Thomas v. State,* 886 S.W.2d 388, 391 (Tex.App.1994); *Stamper v. Commonwealth,* 228 Va. 707, 324 S.E.2d 682, 688 (1985); *Price v. State,* 807 P.2d 909, 915 (Wyo.1991).

forming the specific intent necessary to commit the crimes charged.'" 907 F.2d at 1067. She argued that the jury should have been allowed to consider evidence of her mental defect in determining whether she possessed the mental capacity to intend to distribute drugs. *Id.* In rejecting this argument, the court observed that when a defendant claims to have psychiatric evidence that she was "incapable" of forming the intent necessary for the crime charged, "most often that defendant is speaking of an incapacity to reflect or control the behaviors that produced the criminal conduct. Such evidence is not 'psychiatric evidence to negate specific intent' and should not be admitted." *Id.* at 1066. The court noted that otherwise, as Congress feared, "'the insanity defense [will be] improperly resurrected in the guise of … "diminished responsibility" or some similarly asserted state of mind which would serve to excuse the offense and open the door, once again, to needlessly confusing psychiatric testimony.'" *Id.* (quoting S.Rep. No. 98–225, 98th Cong.2d Sess. 229 (1984), reprinted in 1984 U.S.Code Cong. & Ad. News, 3182, 3411).

Similarly, the Third Circuit has recognized that "only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea as it is normally understood in American law. Even the most psychiatrically ill have the capacity to form intentions, and the existence of intent usually satisfies any mens rea requirement." *Pohlot,* 827 F.2d at 903 (citation omitted). Commentators have argued that "permitting evidence and arguments about a defendant's capacity to form mens rea distracts and confuses the jury from focusing on the actual presence or absence of mens rea." *Id.* at 903–04. "Because psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury's [sic] from focusing on the actual presence or absence of *mens rea,* and (3) 'may easily slide into wider usage that opens up the jury to theories of defense more akin to justification,'" *Cameron,* 907 F.2d at 1067 (quoting *Pohlot,* 827 F.2d at 904–05), such evidence is inadmissible in the federal courts unless it would "'support a *legally acceptable* theory of lack of *mens rea.'*" *Id.* (quoting *Pohlot,* 827 F.2d at 906).

In evaluating a defendant's criminal responsibility, the federal courts look at a defendant's conscious awareness. *See Pohlot,* 827 F.2d. at 906. "Mens rea is generally satisfied … by any showing of purposeful activity, regardless of its psychological origins." *Id.* at 904. "[P]urposeful activity is all the law requires." *Id.* at 907. Here, Dr. Karp's testimony was offered to establish that, because of her limited intelligence and abusive history, defendant was not capable of forming the specific intent required for knowing or intentional child abuse. This is not, according to *Pohlot* and *Cameron,* a legally acceptable theory of lack of *mens rea.*

The defendant was capable of recognizing that her child was injured and that she needed medical attention. Indeed, when defendant found Sheena unconscious, she was aware that Sheena needed medical help. Defendant stated that she was confused and that she did not take Sheena to the hospital for fear that someone would see Sheena's bruises and that Near would harm her if she took any action to help the child. Her actions were clearly purposeful, thus satisfying the *mens rea* requirement. Most federal courts would not, under the theory that defendant lacked *mens rea,* excuse the defendant's conscious failure to act simply because she was motivated by unconscious influences that were the product of her genes or her environment. *See Pohlot,* 827 F.2d at 906.

We now turn to the Arizona cases, *Christensen,* 129 Ariz. at 32, 628 P.2d at 580, and *Gonzales,* 140 Ariz. at 349, 681 P.2d at 1368, relied upon by defendant and the court of appeals as support for the argument that due process requires the trial court to admit defendant's proffered testimony. As we have concluded above, however, precluding this testimony does not violate due process. Moreover, *Christensen* is distinguishable, and *Gonzales* is wrongly decided.

In *Christensen,* this court held that to challenge the element of premeditation, a psychology expert could testify that the defendant reacted impulsively to stress. *Christensen,* 129 Ariz. at 34–35, 628 P.2d at 582–83. We found that the trial court erred by

excluding the proffered testimony because it prevented the defendant from offering evidence to dispute an element of the charge against him. *Id.* at 36, 628 P.2d at 584. The holding was limited, however, in that the expert could not testify specifically whether the defendant was acting impulsively at the time of the homicide. *Id.* at 35–36, 628 P.2d at 583–84.

*Christensen* is distinguishable from the present case because the evidence offered by the defendant in that case was not evidence of his diminished mental capacity. Rather, the defendant merely offered evidence about his behavioral tendencies. He attempted to show that he possessed a character trait of acting reflexively in response to stress. *Id.* at 34, 628 P.2d at 582. The proffered testimony was not that he was *incapable,* by reason of a mental defect, of premeditating or deliberating but that, because he had a tendency to act impulsively, he did not premeditate the homicide. Because he was not offering evidence of his diminished capacity, but only of a character trait relating to his lack of premeditation, the defendant was not precluded from presenting the expert testimony.

In *Gonzales,* on the other hand, a defendant charged with sexual assault and kidnapping attempted to introduce testimony of his diminished mental capacity. 140 Ariz. at 350, 681 P.2d at 1369. He offered expert testimony that his low intelligence and probable organic brain damage affected his ability to reason, to show that he "did not and *could not have* the specific intent to commit the rape," and to aid the jury in assessing credibility. *Id.* at 350–51, 681 P.2d at 1369–70 (emphasis added). We held that the trial court erred in excluding the proffered testimony because it was relevant to the defendant's "mere presence" defense and provided the jury with information essential to the assessment of credibility. *Id.* at 351, 681 P.2d at 1370.

To the extent that *Gonzales* held that expert testimony regarding a defendant's mental capacity is admissible to challenge the requisite mental state of a charged crime,[7] it is incorrect. To convict the defendant in *Gonzales* of unlawful imprisonment, "the jury had to find beyond a reasonable doubt that the defendant was aware or of the belief that his actions or omissions were in the nature of a restriction on [the victim's] movements." *Id.* at 352, 681 P.2d at 1371. We found that the proffered evidence of the defendant's mental condition was probative of his mental state and that the trial court erred in failing to admit it. *Id.* at 353, 681 P.2d at 1372. We neglected to recognize, however, that the evidence was essentially expert testimony on the defendant's cognitive ability to form the requisite mental state. As such, it was evidence of diminished capacity and inadmissible under *Schantz,* 98 Ariz. at 200, 403 P.2d at 521. Accordingly, we overrule *Gonzales* to the extent it allowed evidence of a defendant's diminished mental capacity as a defense to a charged crime.

The dissent asserts that because the defendant was not attempting to argue the affirmative defense of diminished capacity as an excuse for criminal responsibility, the trial court should not have precluded evidence that her mental condition prevented her from acting with specific criminal intent. We disagree. As the dissent notes, Dr. Karp would have provided the jury with information that fear, low intelligence, and psychological trauma resulting from abuse *affected the defendant's capacity* to make the decision to take her child to the hospital. Dissent at 35. This is, of course, diminished responsibility. We have previously "rejected the theory of diminished responsibility which allows evidence of mental disease or defect, not constituting insanity under *M'Naghten,* to be admitted for the purpose of negating criminal intent." *State v. Laffoon,* 125 Ariz. 484, 486, 610 P.2d 1045, 1047 (1980).

■ Dr. Karp's testimony was offered to demonstrate that defendant's mental incapacity negated specific intent. Her testimony was not admissible for this purpose. The testimony did not meet the standards of the one test for criminal responsibility—the

---

7. An alternative ground for finding that the trial court erred in precluding the expert testimony was that such testimony would have aided the jury in assessing the defendant's credibility as a witness. *Gonzales,* 140 Ariz. at 350, 681 P.2d at 1369.

*M'Naghten* test—that Arizona does follow. Furthermore, if we adopted the defendant's position and allowed expert testimony such as this to negate specific intent, the result would be, as we said in *Schantz,* to compel juries to "release[ ] upon society many dangerous criminals who obviously should be placed under confinement." Accordingly, we hold that the trial court did not err by precluding Dr. Karp's testimony regarding the battered-woman syndrome. Consequently, we vacate the court of appeals' decision.

## B. Evidence of Prior Bad Acts

Defendant claims that the trial court erred in admitting evidence of her prior bad acts in violation of Rule 404(b), Arizona Rules of Evidence. The evidence presented was of defendant's relations with her daughter one to one-and-a-half years prior to the incident. The evidence was that defendant (1) left Sheena with her in-laws from the age of two months until she was approximately two years old; (2) struck the child; (3) said she hated Sheena and wished she were dead; and (4) was an outgoing, expressive individual who could stand up for herself. We find that the trial court's admission of this evidence was not an abuse of discretion.

We review a trial court's admission of evidence of prior bad acts under Rule 404(b) for abuse of discretion. *State v. Robinson,* 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1107, *cert. denied sub nom. Washington v. Arizona,* 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1195 (1991). To admit evidence of prior bad acts, the trial court must find that the evidence is admitted for a proper purpose under Rule 404(b), is relevant under Rule 402, and that its probative value is not substantially outweighed by the potential for unfair prejudice under Rule 403. The court must give an appropriate limiting instruction if requested under Rule 105. *State v. Atwood,* 171 Ariz. 576, 638, 832 P.2d 593, 655 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). Defendant claims that the evidence satisfied none of these requirements.

First, she contends that there was no proper purpose for admitting the prior acts. Rule 404(b) states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, [or] intent. . . ." The trial court found the prior acts were admissible to show motive and credibility and as rebuttal to defendant's proffered testimony regarding battered-woman syndrome. Because the court's finding that the evidence was probative on defendant's motive is supported by the relationship between the evidence and the theory of the state's case, we do not consider the other two grounds. The prior acts demonstrated defendant's lack of concern or actual dislike for her child, which could reasonably be construed as a motive for the charged offenses.

Second, the evidence of defendant's prior acts was relevant to the issues at trial. "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988) (adopted in *Atwood,* 171 Ariz. at 638, 832 P.2d at 655); *see also* Ariz.R.Evid. 104(b) (relevancy conditioned on fact). We find that the jury reasonably could have concluded that defendant committed the alleged acts.

Third, the potential for unfair prejudice presented by the prior acts must not substantially outweigh its probative value. Rule 403. The state claims that defendant has waived any claim of prejudice by failing to urge it in the trial court. Review of the record, however, shows that defendant did object on the ground of prejudice, but the trial court failed to explicitly address the necessary balancing.

The trial court should exclude relevant evidence if it is unfairly prejudicial. Ariz.R.Evid. 403. Unfair prejudice results if the evidence has an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror. *State v. Schurz,* 176 Ariz. 46, 52, 859 P.2d 156, 162, *cert. denied,* 510 U.S. 1026, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993). Not all harmful evi-

dence, however, is unfairly prejudicial. *Id.* Defendant's arguments of prejudice relate to her claim that the evidence was not admitted for a proper purpose under Rule 404(b). She has pointed to nothing that suggests that the evidence was unfairly prejudicial. *See State v. Gonzales,* 181 Ariz. 502, 511, 892 P.2d 838, 847 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996). We find that the probative value of these acts was not substantially outweighed by the danger of unfair prejudice.

▮ The final requirement for the admission of evidence of prior acts is that the trial court must give an appropriate limiting instruction if the opponent of the evidence requests one. *Atwood,* 171 Ariz. at 638, 832 P.2d at 655. In this case, the state included a limiting instruction on the prior act evidence with its requested instructions. The trial court found it confusing and stated that it preferred not to give the instruction. The prosecutor informed the trial court that it was required to give the instruction if the defendant requested it. The court noted that the defendant had not requested a limiting instruction and, consequently, declined to give one. Defendant's counsel was present during this exchange. At no time did she request a limiting instruction or object to the trial court's refusal of the state's instruction. It is clear from these facts that defendant waived any such claim on review.

Therefore, we hold that the trial court did not abuse its discretion in admitting evidence of defendant's prior acts. The evidence was relevant to defendant's motive. The jury could have reasonably found the prior acts to have occurred. No unfair prejudice outweighed the probative value. Finally, defendant did not request a limiting instruction and, hence, none was required.

## C. Proximate Causation Instruction

Defendant next contends that the trial court erred in refusing to give her proffered instruction on proximate cause. Defendant claims that she was entitled to an instruction on proximate cause as an element of felony murder where the cause of death is an issue. She cites *State v. Wiley,* 144 Ariz. 525, 540, 698 P.2d 1244, 1259 (1985), *overruled on oth-*

*er grounds, State v. Superior Ct.,* 157 Ariz. 541, 544, 760 P.2d 541, 544 (1988), and *State v. Smith,* 160 Ariz. 507, 510, 774 P.2d 811, 814 (1989).

*Wiley* merely held that a proximate cause instruction was not improper. 144 Ariz. at 540, 698 P.2d at 1259. In *Smith,* we stated, "in felony murder cases in which causation is in issue, a proximate cause instruction should be given if it would be helpful to the jury." 160 Ariz. at 510, 774 P.2d at 814. This was dicta, however, as we held that it was not fundamental error for the trial court not to give a proximate cause instruction *sua sponte* when causation was not at issue in the trial. *Id.* Moreover, the quoted language does not require such an instruction even when causation is an issue.

▮ A trial court is not required to give a proposed instruction when its substance is adequately covered by other instructions. *Wiley,* 144 Ariz. at 540, 698 P.2d at 1259. Here, the trial court refused the proffered instruction because it would confuse the jury. It did instruct the jury on the elements of the crime, including causation. The instructions, considered in their entirety, adequately reflect the law. *State v. Gallegos,* 178 Ariz. 1, 10, 870 P.2d 1097, 1106, *cert. denied,* 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). Furthermore, both the state and defendant's counsel argued causation to the jury in closing arguments. *See State v. Rodriguez,* 114 Ariz. 331, 334, 560 P.2d 1238, 1241 (1977) (taking into account the closing arguments of counsel in assessing the adequacy of instructions). We find that the trial court did not err in refusing defendant's jury instruction on proximate causation.

## D. Voir Dire

▮ Defendant next argues that the trial court erred by informing the jurors during voir dire that, if convicted, defendant would not be sentenced to the death penalty. Defendant contends that such comments encouraged the jury to convict her on a lesser quantum of evidence than they might otherwise require. We disagree.

In *State v. Koch*, 138 Ariz. 99, 105, 673 P.2d 297, 303 (1983), this court held that an instruction stating that the defendant would not be subject to the death penalty should not have been given. We found, however, that the instruction was not prejudicial because it did not suggest that, if convicted, the defendant would be treated with leniency. *Id.* Here, the court did not mention leniency and instructed the jury at the end of trial not to consider possible punishment. We find no prejudice to the defendant.

Additionally, in *State v. Dawson*, 162 Ariz. 429, 783 P.2d 1221 (App.1989), the court of appeals found that there was "no error, fundamental or otherwise" in instructing jurors during voir dire that the defendant would not be subject to the death penalty. *Id.* at 430, 783 P.2d at 1222. The trial court sought to alleviate the possibility that concern over the death penalty might destroy jurors predisposed against capital punishment. *Id.* The trial court also wanted to avoid the risk that those opposed to the death penalty would seek to be excused from jury service in order to avoid a life-or-death decision. *Id.* The court of appeals approved the instruction and comments. In this case, the trial court voiced similar concerns in instructing the jury, but because the defendant was not prejudiced and *Dawson* encourages the type of instruction given, we find no error.

Defendant argues that a recent United States Supreme Court case, *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), requires that if one sentencing circumstance favorable to the state was mentioned (that the death penalty was not being sought), the jury must be informed of one sentencing circumstance favorable to the defendant. *Simmons*, however, is inapposite. It involved a sentencing jury, not an instruction to a jury charged with determining guilt. In Arizona, the trial judge determines punishment. *State v. Allie*, 147 Ariz. 320, 326, 710 P.2d 430, 436 (1985).

### E. Cruel and Unusual Punishment

Finally, defendant argues that her sentence is grossly disproportionate to her degree of involvement in Sheena's death and thus constitutes cruel and unusual punishment in violation of the Arizona and United States Constitutions. She asserts that her limited intelligence and history of abuse also militate against the sentence. We disagree.

▆▆▆ A sentence is cruel and unusual only when there is gross disproportionality between the offense and the sentence. *State v. DePiano*, 187 Ariz. 27, 926 P.2d 494 (1996). In this case, the defendant was convicted of two counts of child abuse and first-degree murder. By any measure, no inference of gross disproportionality could possibly arise for these offenses. Because there is no inference of gross disproportionality, no intra- or inter-jurisdictional analysis is required.

### F. Cross–Appeal

The state cross-appeals, contending that the trial court erred in instructing the jury on the elements of the crime. Because we have resolved all issues against the defendant, this issue is moot.

### III. CONCLUSION

For the foregoing reasons, we vacate the court of appeals' opinion and affirm defendant's conviction. Additionally, we overrule *State v. Gonzales*, 140 Ariz. 349, 681 P.2d 1368, to the extent it is inconsistent with this opinion.

MOELLER and MARTONE, JJ., concur.

ZLAKET, Chief Justice, concurring in the result.

This case strikes me as an extremely poor vehicle for delivering sweeping pronouncements about the admissibility of expert psychological testimony in all criminal cases, yet I fear that is precisely what today's majority has done. The parties to this action seem unable to concur on anything of substance, including the very existence and legitimacy of "battered woman syndrome." They certainly do not agree about whether we are dealing here with "diminished capacity," "diminished responsibility," or simply those characteristics and propensities of a mental condition that may bear upon the *mens rea* aspect of the crimes in question. Unfortu-

nately, the majority and dissenting opinions exhibit a similar lack of accord.

The absence of precision with which the record treats these matters is problematic. From the outset, defense counsel has been inconsistent in articulating the reasons for which the psychological evidence was offered. Even the expert witness appears to have been unclear about the scope and purpose of her testimony. Add to this a generous measure of disharmony in the case law, and it is not surprising that the majority and dissent are able to reach so little common ground. In *U.S. v. Pohlot*, 827 F.2d 889, 903 (3rd Cir.1987), relied on by both, the court observed:

> As the conflicting cases ... indicate, the terms "diminished responsibility" and "diminished capacity" do not have a clearly accepted meaning in the courts. To the extent that American courts have adopted cognate doctrines, they generally have done so sub silentio.

In my view, today's decision only adds to the lack of consistency about which *Pohlot* speaks.

It is difficult for me to accept the majority's broad attack upon the use of psychological evidence. I am unprepared to agree that expert testimony must be strictly limited to *M'Naghten* insanity under all circumstances in any and every case, or that psychological evidence tending to negate an essential element of the crime charged can never be admitted. Such an expansive holding seems both unwise and unnecessary.

I also subscribe to the dissent's view that there exists a significant distinction between testimony establishing diminished capacity or responsibility, both unrecognized in Arizona, and that tending to rebut the existence of a fact critical to a finding of guilt. In a case such as this, where punishment varies dramatically according to defendant's mental state at the time of the crime, the distinction becomes even more pronounced. The majority opinion leaves no room to explore a defendant's state of mind, short of *M'Naghten* insanity. Thus, it effectively obliterates important statutory distinctions between knowing, intentional, reckless, or negligent conduct. It also injects a component of strict liability into these offenses, which the legislature chose not to put there.

Finally, I see nothing wrong with *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), or *State v. Gonzales*, 140 Ariz. 349, 681 P.2d 1368 (1984), and disagree that the latter should be overruled. It is noteworthy that neither decision has provoked any legislative response in over a decade.

Despite all of the above, however, I agree with the majority's final resolution of this case. The overwhelming weight of evidence establishes that the defendant's conduct was *knowing*, if not intentional. She admitted as much to the investigating police officers. In my opinion, nothing within the reasonable scope of Dr. Karp's proposed testimony would have authorized a contrary finding. Her description of "battered woman" characteristics suggested, at most, that defendant may not have appreciated the full range of possible consequences flowing from her conduct and may have had difficulty acting on what she did know. Neither propensity would have absolved her of criminal culpability under the facts here or the statutes in question.

FELDMAN, Justice, dissenting.

I dissent from the portion of the opinion designated Part II(A), *Expert Testimony* and consequently from the result. The real issue is not expert testimony but the right of a defendant to present evidence negating the elements of the charge. In my view the majority opinion deprives a defendant of that right, thereby violating the due process clauses of both the state and federal constitutions.

Defendant was charged with and convicted of one count of child abuse under circumstances other than those likely to produce death or serious physical injury, a class 4 felony; and one count of child abuse under circumstances *likely* to produce death or serious injury, a class 2 felony. *See* A.R.S. § 13–3623(B) and (C). We focus on the class 2 felony conviction because it was the predicate for the first-degree felony murder conviction, for which Defendant was sentenced to a mandatory minimum of thirty-five years'

imprisonment, without possibility of parole, commutation, or time off for good behavior.[8]

As relevant to this case, the statute provides that any person who has custody of and permits a child to be injured or endangered is guilty of a class 2 felony if the person acted intentionally or knowingly. *See* A.R.S. § 13–3623(B)(1). The person is guilty of a class 3 felony, however, if he or she acted recklessly or a class 4 felony if he or she acted with criminal negligence. *See* § 13–3623(B)(2) and (3). Defendant was charged in the alternative with violating all three subsections.

Some facts are clear. Defendant permitted her child to be injured or endangered by failing to obtain medical care and by placing her or allowing her to remain in a dangerous situation under the control of Vincent Near, the man with whom Defendant was living in an abusive relationship. In this case, therefore, the only issue was Defendant's mental state. The jury was instructed on all three degrees of child abuse. If her actions were intentional or knowing, Defendant would be convicted of first-degree felony murder and punished for a class 2 felony (enhanced because the child was less than fifteen years of age). *See* §§ 13–3623(B)(1); 13–604.01. Defendant would not be convicted of first-degree felony murder if her conduct were reckless or criminally negligent and her punishment would be significantly less severe. *See* §§ 13–701; 13–702.

To address the issue of whether she acted knowingly, intentionally, recklessly, or with criminal negligence, Defendant offered the testimony of Dr. Cheryl Karp, a qualified, certified psychologist, who was to relate Defendant's history of abuse to rebut the state's case on *mens rea*. The state moved to preclude, arguing that evidence of the so-called battered woman syndrome was inadmissible because that syndrome applied only when the defendant was charged with injuring or killing the abuser. Before trial, the judge denied the state's motion to preclude Dr. Karp's testimony. However, the judge also ordered defense counsel to avoid discussing Defendant's history of abuse in opening

statement and later precluded Dr. Karp from testifying about the battered woman syndrome and its impact on Defendant's ability to make decisions. Then, as the court of appeals put it, Defendant

> made an offer of proof that Karp ... would have testified that she had reviewed the police reports and had interviewed Mott and reviewed tests she had taken and that ... Mott possessed the characteristics of a battered woman. These characteristics include "learned helplessness" or the passive acceptance of abuse, development of a traumatic bond that impedes the woman's ability to stand up to the batterer, fear of male authority figures, lying to protect the batterer and inability to accurately perceive danger and to protect herself and others from it.

*State v. Mott,* 183 Ariz. 191, 193, 901 P.2d 1221, 1223 (App.1995). Such evidence, of course, directly addresses the mental element and degrees of the crimes charged.

Defense counsel assured the trial judge that Dr. Karp would not be asked to testify about Defendant's state of mind at the time of the offense but only about the effect of physical, sexual, and mental abuse on the thought process of battered women such as Defendant, and the effect such a history might have on Defendant's decision-making, rationalization, comprehension, and the like. Thus, the offer complied with the rule we have set down for such evidence in cases in which prosecution witnesses are allowed to testify about the behavioral patterns of victims of incest or child molestation. *State v. Moran,* 151 Ariz. 378, 384, 728 P.2d 248, 254 (1986); *State v. Lindsey,* 149 Ariz. 472, 474–75, 720 P.2d 73, 75–76 (1986).

We have permitted testimony from experts to explain the tendency of child victims to recant and testify inconsistently, and to explain other psychological phenomena that afflict such victims and may bear on their credibility before a jury. *See Moran,* 151 Ariz. at 384, 728 P.2d at 254; *Lindsey,* 149 Ariz. at 474–75, 720 P.2d at 75–76. Defendant's offer in this case, therefore, did not

---

**8.** Defendant was also given a mandatory twelve-year consecutive sentence on the class 4 child abuse conviction, making her total sentence forty-seven years.

stray beyond the permissible limits we have set for analogous expert testimony.

The trial judge nevertheless precluded Dr. Karp's testimony; in fact, he refused to even allow defense counsel to make a more specific offer of proof. It was not until defense counsel raised the issue again just before closing arguments that he was allowed to put the following into the record:

> Dr. Karp would have testified to [Defendant's] history, history of suffering physical abuse as a child at the hands of her parents, sexual abuse, rape, molest at the hands of her brother, her friend's father and other individuals while she was a child and then her continued physical abuse by boyfriends, by her husband, and by Mr. Near, and that abuse made her—how she fit the category of being a battered woman, along with all the expert testimonies of what a battered woman means, how that would relate to her decision making as an adult.

Reporter's Transcript (R.T.), Nov. 13, 1991, at 13.

As her later testimony at Defendant's mitigation hearing illustrated, Dr. Karp would have provided the jurors with information from which they might conclude that fear, low intelligence, and psychological trauma resulting from a lifetime of abuse affected Defendant's ability to make "the kind of decision it would take in order to take her child to the hospital." R.T., Nov. 15, 1991, at 11, 18, 24.

### A. The majority confuses the concept of diminished capacity with evidence addressing the *mens rea* element of the crime

#### 1. Diminished capacity and *mens rea*

The majority argues that Arizona has not adopted the defense of diminished capacity. I agree that *M'Naghten* is still the rule in Arizona. *See* A.R.S. § 13–502. But it is

quite apparent that Defendant is not advancing the affirmative defense of diminished capacity. As the majority must and does concede, we deal here with evidence "not offered as a defense to excuse [Defendant's] crimes, but rather [with] evidence to negate the *mens rea* element of the crime." In other words, the evidence was offered to help the jury determine whether Defendant acted knowingly, intentionally, recklessly, or with criminal negligence—the only real issues in the case. The record shows quite clearly that Defendant's counsel conceded her capacity and sought only to show how her history of abuse affected her decision-making about whether to take the child for medical care.[9] In fact, battered woman's syndrome was withdrawn as an affirmative defense, and not even the trial judge viewed the issue to be lack of capacity:

> Assuming we were not talking M'Naughton insanity, what difference would it make why *a person who is capable* of intending to do something, of acting or omitting, . . . what difference does it make why [it was done]?

R.T., Nov. 8, 1991, at 87, 90 (emphasis added).

The answer to the judge's question is clear—the difference in mental state determines the degree of the crime. Although Defendant *was capable* of acting intentionally, if she did not act knowingly or intentionally, she could not be found guilty of felony murder.

It is also clear that the trial judge and the prosecutor agreed that testimony regarding the effect of Defendant's abusive past on her decision-making capacity that evening was admissible—but only if Defendant herself took the stand and so testified:

> Then [the jury] ought to hear [evidence of what went into Defendant's decision-making] from the defendant and not Dr. Karp who is extrapolating one from the other, extrapolating test results to an evening in question when she was not there.

as the majority recognizes at other places, the offer was made for the permissible purpose of enabling the jury to determine Defendant's intent.

---

9. The majority likewise mischaracterizes Dr. Karp's testimony, arguing at one point that it "was offered to demonstrate that defendant's mental incapacity negated specific intent." But

R.T., Nov. 8, 1991, at 89–90 (Prosecutor).[10]

Defendant invoked her Fifth Amendment right and chose not to testify. Thus, when the trial judge precluded Dr. Karp's testimony, the case went to the jury without any evidence directly relating to Defendant's state of mind at the time of the acts charged. Thus, although the legislatively prescribed elements of the different crimes charged require the state to prove conduct that is either intentional, knowing, reckless, or criminally negligent, the only evidence that bore directly on those issues was rejected by the trial judge.[11] There was, in short, no issue left to try under the circumstances of this case.

### 2. Psychological testimony

Again, as the majority acknowledges, "the evidence of defendant's history of being battered and of her limited intellectual ability was ... offered ... as evidence to negate the *mens rea* element of the crime." *Ante* at 540, 931 P.2d at 1050. The majority further acknowledges that "[s]uch evidence is distinguishable from an affirmative defense that excuses, mitigates, or lessens a defendant's moral culpability due to his psychological impairment." *Ante* at 540, 931 P.2d at 1050. Yet, despite recognizing this distinction, the majority takes the inconsistent position that use of psychiatric evidence to negate *mens rea* is the same as an attempt to prove diminished capacity. "Because the legislature has not provided for a diminished capacity defense, we have since consistently refused to allow psychiatric testimony to negate specific intent." *Ante* at 540, 931 P.2d at 1050.

But as many courts have recognized, "the use of expert testimony for this purpose is entirely distinct from the use of such testimony to relieve a defendant of criminal responsibility based on the insanity defense or one of its variants, such as diminished capacity." *United States v. Pohlot,* 827 F.2d 889, 897 (3rd Cir.1987) (citing *United States v. Demma,* 523 F.2d 981, 986 n. 14 (9th Cir.1975)), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988); *United States v. Staggs,* 553 F.2d 1073, 1075 (7th Cir.1977); *United States v. Bennett,* 539 F.2d 45, 53 (10th Cir.), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976); *United States v. Brawner,* 471 F.2d 969, 998–1002 (D.C.Cir.1972); *Rhodes v. United States,* 282 F.2d 59, 60–61 (4th Cir.), *cert. denied,* 364 U.S. 912, 81 S.Ct. 275, 5 L.Ed.2d 226 (1960); *see also United States v. Cameron,* 907 F.2d 1051 (11th Cir. 1990); *United States v. Fazzini,* 871 F.2d 635 (7th Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989); *United States v. Bartlett,* 856 F.2d 1071 (8th Cir. 1988); *United States v. Twine,* 853 F.2d 676 (9th Cir.1988).

The majority believes that these cases are inapplicable because they "do not address the *constitutionality* of precluding a defendant from introducing evidence of diminished capacity to challenge the element of specific intent." *Ante* at 542, 931 P.2d at 1052. But these cases are directly applicable because they recognize and apply the distinction *between* evidence of diminished capacity, which would be an affirmative defense to the crime charged regardless of its elements, and evidence that challenges or refutes an element of the specific intent required by the particular statute. The distinction is between evidence claiming the mental *inability* to commit the otherwise criminal conduct and evidence from which the jury may infer whether a defendant, who admittedly had the ability to commit the crime, *actually had* the specific mental state that the legislature has required to be proven as an element of a particular crime.

---

10. Inexplicably, neither the trial judge, the prosecutor, nor the majority explains why Defendant could give evidence about her mental state but a qualified psychologist who had examined Defendant could not give such evidence.

11. That rejection, we should note, was not based on any evidentiary offer or formal objection raising the issue on which the majority today decides the case: "We hold that the proffered evidence was inadmissible as an attempt to prove defendant's diminished capacity." The state made no such objection. For some reason the doctrine of waiver, which we apply so assiduously in other cases, does not apply in this case. *Cf. State v. Miller,* 186 Ariz. 314, 318, 921 P.2d 1151, 1155 (1996) (issues of prosecutorial misconduct, admission of other act evidence, use of peremptory challenges, and excusing jurors for cause all waived when raised for the first time on appeal).

[I]t is clear that the *mens rea* variant of diminished capacity is not a separate defense that deserves to be called "diminished capacity" or any other name connoting that it is some sort of special, affirmative defense. The defendant is simply introducing evidence, in this case evidence of mental abnormality, to make the following claim: "I did not commit the crime charged because I did not possess the requisite *mens rea.*" This is not an affirmative defense [such as insanity] whereby the defendant admits or has proved against him the elements of the crime charged, but then raises a claim of justification or excuse.... Rather, the defendant is straightforwardly denying the prosecution's claim that a requisite mental element was present at the time of the offense. He is claiming that he is not guilty of that crime at all, although he may be guilty of a lesser crime if all the elements of the latter are proven.

Stephen J. Morse, *Undiminished Confusion in Diminished Capacity*, 75 J.CRIM.L. & CRIMINOLOGY 1, 6 (1984). As Professor Morse, an attorney, law professor, and practicing mental health clinician explains, courts, including ours today, have confused these distinct concepts. *Id.* at 7 n. 19. As a result, such courts wrongly preclude evidence negating *mens rea* under a mistaken belief that it is a form of diminished capacity or insanity that fails to match the *M'Naghten* rule. *Id.*

Again, I agree with the majority that the legislature has not provided for a diminished capacity defense. Thus, if Defendant had argued that she lacked *capacity* to form the requisite mental state, thus offering the unrecognized affirmative defense of diminished capacity, then the majority need go no farther than to say so. However, as the majority acknowledges, Defendant's expert testimony *"was not offered as a defense to excuse her crimes"* but only "to negate the *mens rea* element." *Ante* at 540, 931 P.2d at 1050. Thus, the trial court erred by precluding Dr. Karp's testimony, thereby depriving Defendant of the ability to test the *mens rea* element of the state's case in the adversarial process. In my view, by so ruling the court violates Defendant's right to due process of law. That very issue is the subject of the recent United States Supreme Court case of *Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996).

## B. Defendant had a due process right to present Dr. Karp's testimony

*Egelhoff,* in which the five-to-four Court filed five separate opinions, reversed a Montana Supreme Court judgment. The Montana court held that due process was violated by a statute requiring Montana courts to reject evidence of voluntary intoxication when offered to rebut the *mens rea* element of a criminal offense. *See State v. Egelhoff,* 272 Mont. 114, 900 P.2d 260 (1995). In the United States Supreme Court, Justice Scalia wrote for the plurality, Justice Ginsberg filed a concurring opinion, Justice O'Connor filed a dissenting opinion in which three other justices joined, and Justices Souter and Breyer filed separate opinions, although they concurred in Justice O'Connor's dissent. The majority opinion in the present case is contrary to *each and every opinion.*

In *Egelhoff,* the plurality acknowledged that due process guarantees a defendant the right to present evidence to rebut the elements of a charge but concluded there was no due process violation because the right "to have a jury consider evidence of his voluntary intoxication in determining whether he possesses the requisite mental state" was not a "fundamental principle of justice." —— U.S. at ——, 116 S.Ct. at 2015 (Scalia, J., Rehnquist, C.J., Kennedy and Thomas, JJ.) (citing Hale, Coke, and Blackstone). Justice Scalia noted that the common law had always disallowed voluntary intoxication as a defense. More important, as the earliest case cited by Justice Scalia indicates, it was not merely the state of voluntary intoxication or its concomitant effects on *mens rea* that permitted rejection of the defense but the fact that the defendant's unimpaired and voluntary act caused the intoxication.

[I]f a person that is drunk kills another, this shall be Felony, and he shall be hanged for it, and yet he did it through Ignorance, for when he was drunk he had no Understanding nor Memory; but inasmuch as that Ignorance *was occasioned by*

*his own Act and Folly,* and he might have avoided it, he shall not be privileged thereby.

*Id.* at ——, 116 S.Ct. at 2018 (quoting *Reniger v. Fogossa,* 1 Plowd. 1, 19, 75 Eng.Rep. 1, 31 (K.B.1550)) (emphasis added).[12] Unlike those who willingly become intoxicated, battered women and victims of child abuse do not voluntarily cause the defect in their mental process. Thus, mental impairment from battered woman's syndrome is fundamentally different than that caused by voluntary intoxication.

Justice Ginsberg concurred in reversing the Montana Supreme Court's judgment only because she believed that by forbidding the use of voluntary intoxication as a defense the Montana legislature had simply redefined the *mens rea* element of the offense, " 'extract[ing] the entire subject of voluntary intoxication from the *mens rea* inquiry,' and thereby rendering evidence of voluntary intoxication logically irrelevant to proof of the requisite mental state." *Id.* at ——, 116 S.Ct. at 2024 (Ginsberg, J., concurring in the judgment).[13]

Here, however, we are not dealing with a statute prohibiting battered woman's syndrome testimony. To the contrary, with the exception of voluntary intoxication the legislature has left all the statutorily possible *mens rea* formulations as elements of the statutes under which Defendant was convicted. *See* A.R.S. § 13–503. Because the evidence offered was logically very relevant to the requisite *mens rea,* this case presents the issue of whether a criminal defendant has the right to defend against every element of the charged offense—including the *mens rea* specified by the legislature—with relevant, credible, and competent evidence. Our legis-

lature has required, not forbidden, the evidence offered. Applying Justice Ginsberg's views, we must therefore conclude that evidence bearing directly on the elements of the crime must be admitted under the constitution's due process guarantees. *See Egelhoff,* —— U.S. at ——, 116 S.Ct. at 2024 (Ginsberg, J., concurring).

If we then turn to the views expressed by Justice O'Connor, in which Justices Stevens, Breyer, and Souter joined, we again must conclude that Defendant's due process rights were violated. The legislature specified the mental states of intentional, knowing, reckless, or criminal negligence as elements of the crime. *See* A.R.S. § 13–3623(B)(1) through (3). With the offenses thusly defined, "a defendant has the right to insist that the State prove beyond a reasonable doubt every element of an offense charged." *Egelhoff,* —— U.S. at ——, 116 S.Ct. at 2027 (O'Connor, Stevens, Souter & Breyer, JJ., dissenting) (citing *McMillan v. Pennsylvania,* 477 U.S. 79, 85, 106 S.Ct. 2411, 2415–16, 91 L.Ed.2d 67 (1986); *Patterson v. New York,* 432 U.S. 197, 211, n. 12, 97 S.Ct. 2319, 2327 n. 12, 53 L.Ed.2d 281 (1977). It is wholly inconsistent, when the legislature requires proof of a specific *mens rea,* that the state may prevent the jury from considering evidence relevant to rebut that element of the crime. *See Egelhoff,* —— U.S. at ——, 116 S.Ct. at 2028 (O'Connor, Stevens, Souter & Breyer, JJ., dissenting). It is even worse to do so when the different degrees of the crime turn on the question of *mens rea* and when Defendant's conviction turns on the degrees of the crime.

The Due Process Clause protects those "principle[s] of justice so rooted in the tradi-

---

**12.** Likewise, Arizona's rejection of intoxication as a defense to conduct or a mental state is conditioned on the intoxicated state resulting from the defendant's voluntary act:

> Temporary intoxication *resulting from* the *voluntary* ingestion, consumption, inhalation or injection of alcohol, an illegal substance ... or other psychoactive substance or the abuse of prescribed medications does not constitute insanity and is not a defense for any criminal act or requisite state of mind.

A.R.S. § 13–503 (emphasis added). The validity of this statute, as directed and applied only to *voluntary* intoxication, was upheld in *State v.*

*Ramos,* 133 Ariz. 4, 648 P.2d 119 (1982). One would assume, therefore, that a defect in thought process resulting from *unwilling* ingestion of drugs would be admissible on the issue of *mens rea.* If this is so, then why would defects resulting from abuse involuntarily received not be admissible?

**13.** *But see id.* at ——, 116 S.Ct. at 2031 (O'Connor, Stevens, Souter & Breyer, JJ.) (finding Justice Ginsberg's reading of Montana law "plainly inconsistent with that given by the Montana Supreme Court").

tions and conscience of our people as to be ranked as fundamental." *Patterson*, 432 U.S. at 201–02, 97 S.Ct. at 2322. Indeed, the fabric of due process is spun from the thread of such fundamental principles as those guaranteeing the right of a criminal defendant to put the state's case to a meaningful adversarial test and to rebut each element of the charged offense with competent, credible, and relevant evidence. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *see also Crane v. Kentucky*, 476 U.S. 683, 690–91, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984) (due process requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense"). Allowing the state to "first determine the elements of the crime it wishes to punish, and then thwart the accused's defense by categorically disallowing the very evidence that would prove [her] innocent" violates these principles. *Egelhoff*, —— U.S. at ——, 116 S.Ct. at 2029 (O'Connor, Stevens, Souter & Breyer, JJ., dissenting).

The majority virtually ignores any analysis of *Egelhoff*, instead relying for its conclusion on cases that do not withstand scrutiny on the due process issue. The majority cites primarily *Fisher v. United States*, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), and *State v. Schantz*, 98 Ariz. 200, 403 P.2d 521 (1965). These cases predate *Crane* (1986), *Patterson* (1977), and *Chambers* (1973).

*Fisher* is actually irrelevant to the question before us. The issue in *Fisher*, as the Court characterized it, was "the contention of the defense that the mental and emotional qualities of [the defendant] were of such a level at the time of the crime that he was *incapable* of deliberation and premeditation although he was then sane in the usual legal sense." 328 U.S. at 466, 66 S.Ct. at 1320 (emphasis added). As noted, incapacity is not Defendant's argument in this case. In *Fisher*, unlike the present case, the trial judge allowed the psychiatrist to testify, the defendant was allowed to present expert psychiatric evidence about his mental condition, and the jury was in fact instructed that:

> It is further contended that even if sane and responsible, there was no deliberate intent to kill, nor in fact any actual intent to kill. Therefore if not guilty by reason of insanity, the defendant at most is guilty only of second degree murder or manslaughter, according as you may find he acted with or without malice.

*Id.* at 467 n. 3, 66 S.Ct. at 1320 n. 3. Thus, unlike our case, Fisher was permitted to introduce psychiatric testimony from which the jurors were instructed that they could infer he did not possess the requisite mental state. All that Fisher was properly denied was an instruction on diminished capacity or, as the court termed it, partial responsibility. In citing *Fisher*, today's majority confuses the discredited affirmative defense of diminished capacity with a defendant's due process right to present evidence negating an element of the crime charged.[14]

The majority further argues that *Fisher* "stands for the proposition that state legislatures may, without violating the constitution, preclude defendants from offering evidence of mental and psychological deficiencies to

---

14. The majority clearly confuses the impermissible use of evidence to establish a lack of capacity short of *M'Naghten* as a defense to the crime with the constitutionally-guaranteed right to present such evidence to enable the jury to determine the existence or non-existence of the specific *mens rea* required by the elements of the charged crime. For instance, the majority notes in passing that

> most of the federal courts that explicitly recognize that evidence of mental abnormality is admissible on the issue of mens rea, prohibit

the testimony offered by defendant in this case. [citations omitted]

In *Cameron* [for example], the defendant claimed that schizophrenia "rendered her *incapable of forming the specific intent necessary* to commit the crimes charged."

*Ante* at 542–543, 931 P.2d at 1052–53 (emphasis added). But in the present case, Defendant did not seek to show incapacity to act intentionally but only that her mental condition made it more likely that she acted recklessly. See R.T., Nov. 8, 1991, at 87; Nov. 13, 1991, at 13; Nov. 15, 1991, at 11, 18, 24.

challenge elements of a crime." This contention is quite dubious. In *Egelhoff,* which involved Montana's preclusion of the mental and psychological deficiencies induced by voluntary intoxication, not one of the five opinions cited or relied on *Fisher,* and all opinions acknowledged a defendant's right to present evidence. The only question was whether that right extended to voluntary intoxication.

The majority also overrules *State v. Gonzales,* 140 Ariz. 349, 681 P.2d 1368 (1984), concluding that *Gonzales* was improperly decided because it is contrary to *Schantz* and because the evidence offered in *Gonzales* was evidence of diminished capacity and therefore inadmissible. But the evidence in *Gonzales* was not evidence of diminished capacity at all; the defendant proffered and the trial court excluded evidence that defendant suffered from organic brain syndrome that impaired his cognitive functioning. The evidence was relevant to the issue of whether defendant, convicted of unlawful imprisonment, acted knowingly in restraining the victim. *Id.* at 352–53, 681 P.2d at 1371–72. We reversed the conviction in *Gonzales,* not because we were establishing the diminished capacity defense but because "the trial court's exclusion of the testimony effectively precluded the defendant from introducing evidence essential" to his mere presence defense. *Id.* at 351–52, 681 P.2d at 1370–71. In relying on *Schantz* in overruling *Gonzales,* the majority simply ignores *Chambers* and its progeny, including *Egelhoff.*

## C. Neither jurisprudential considerations nor case authority supports the majority's conclusion

The courts that have considered a defendant's right to present evidence addressing the *mens rea* element of a crime since the decisions in *Crane, Trombetta,* and *Chambers* have reached conclusions opposite to that reached today. And, as noted, nearly every federal circuit has recognized the salient distinction between *mens rea* rebuttal evidence and affirmative defenses and now allows evidence rebutting the *mens rea* element.

In considering the precise issue raised in this case, the federal cases interpret 18 U.S.C. § 17, the Insanity Defense Reform Act of 1984, by which Congress codified the *M'Naghten* rule and specifically provided that anything less would not be a defense. The statute specifically provides: "Mental disease or defect [short of *M'Naghten* insanity] does not otherwise constitute a defense." 18 U.S.C. § 17(a). This language, if contained in Arizona law—which it is not—might arguably provide a springboard to reach the majority's conclusion in this case. But even with that springboard, the federal courts have been unwilling or unable to reach such a conclusion. They have rejected the federal government's argument—one not even made by the state in the case before us—that evidence of mental abnormality is never admissible to negate *mens rea. See, e.g., Pohlot,* 827 F.2d at 896–97 (citing cases).

Although some courts have attempted to draw distinctions between diminished capacity, forbidden by the reform act, and so-called diminished responsibility, which tends to disprove the *mens rea* required by specific intent crimes, I would prefer to leave labels aside. It seems fairly clear that if specific intent is a required element of a crime, evidence of mental abnormality that tends to negate that intent is admissible.

> Suffice it to say that the several uses to which these labels have been put has often hindered the correct application of the two very distinct ideas that are applied under one, both, or neither of these labels [citing cases and authorities]. Regardless of the semantic "war of labels," both Congress and the courts have recognized the crucial distinction between evidence of psychological impairment that supports an "affirmative defense," and psychological evidence that negates an element of the offense charged. "Affirmative defense" evidence of mental impairment, when specifically recognized and defined by the legislature, must be raised by the defendant and can justify or "excuse" conduct that is otherwise criminal. *See* W. LaFave & A. Scott, Criminal Law 152 (1972). Psychological evidence that aids the trier in determining the defendant's specific state of mind with regard to the actions she took at the time the charged offense was committed, by

contrast, is not an affirmative defense but is evidence that goes specifically to whether the prosecution has carried its burden of proving each essential element of the crime—at least when specific intent is at issue.

*Cameron*, 907 F.2d at 1063. In fact, the House Judiciary Committee of the Congress, in considering the Insanity Defense Reform Act, took the testimony of leading academicians in the field, lawyers, and commentators and made an important distinction that eludes today's majority:

> The use of mental disorder to negate mental state elements of crimes should not be confused with the diminished capacity defense as developed by the California courts during the 1960s and 1970s. Under that doctrine, a defendant could escape responsibility for a crime by demonstrating not that he or she lacked the required specific intent but rather that his or her capability of entertaining that intent was not, because of mental disorder, commensurate with that of nondisordered people.

H.R.Rep. No. 98–577, 98th Cong. 1st Sess. 15 n. 24 (1983), cited in *Pohlot*, 827 F.2d 889.

The committee also recognized what today's majority does not: "*[M]ental disorders will remain relevant, of course, to the issue of the existence of a mental state required for the offense, such as the specific intent required for certain crimes. This accords with current practice.*" *Id.*, quoting H.R. Rep. at 14 (emphasis supplied in *Pohlot*). As Senator Hatch, chair of the Senate committee, indicated, "The California doctrine [of diminished responsibility] bears little if any relevance to the issue of capacity to form criminal intent that may be relevant under the *mens rea* approach." *Id.*, citing 130 Cong. Rec. S418–19 (Daily Ed. Jan. 30, 1984). The House Judiciary Committee put it well:

> By distinguishing the affirmative defense of insanity from the narrow *mens rea* /mental state requirements, *the committee's approach meets the constitutional requirement that the prosecutor prove all elements beyond a reasonable doubt* while placing on the defendant the burden of demonstrating a reason for exculpation

that presumes the existence of these elements.

*Pohlot*, 827 F.2d at 903 (quoting H.R. at 14) (emphasis added).

The congressional report, the federal cases, and the prior practice all make clear that a distinction exists between 1) affirmative defenses such as insanity, under which Arizona still requires the evidence to conform to that traditionally required under the *M'Naghten* Rule, and 2) constitutionally required evidence that is directed to the *mens rea* of specific-intent crimes. Today's majority has confused the two. When the legislature has required a specific intent, such as intentional or reckless action, as an element that the state must prove beyond a reasonable doubt to convict, the state cannot forbid the defendant's offer of evidence of mental conditions and abnormalities relevant to whether the defendant had one of the required mental states.

Of course, applying the distinction between evidence of whether a defendant lacked capacity or was unable to form an intent and evidence of whether a defendant possessed a required mental state may be difficult, and courts must be careful to allow only evidence that directly negates *mens rea*. *See United States v. Marenghi*, 893 F.Supp. 85, 91 (D.Maine 1995) (allowing expert testimony of battered woman's syndrome so long as it is relevant to the issue of *mens rea* ).

I do not believe, however, that the difficulties involved in making this distinction are beyond our ability to overcome; we have demonstrated repeatedly our ability to resolve other difficult evidentiary issues. In any event, difficulty in making distinctions between proper and improper evidence seems to me a wholly inadequate reason for categorically disallowing proper evidence.

**D. The majority has failed to follow proper procedure in reaching the issues**

One further point must be made in light of Justice Zlaket's disagreement with the majority analysis. *See ante* at 547–548, 931 P.2d at 1057–58. As Justice Zlaket points out, today's majority has gone beyond what is required to decide the case before it. *Id.*

The adequacy of the offer of proof and the possible lack of record fact as foundation for admission of the expert's opinion were sufficient to permit the majority to affirm on an evidentiary basis. *See ante* at 548, 931 P.2d at 1058. Instead, the majority chose to make fundamental, substantive changes in Arizona law, limiting *State v. Christensen* and overruling *State v. Gonzales*. *Ante* at 544, 931 P.2d at 1054. This, I believe, was not only procedurally unnecessary but improper. *See Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 345, 861 P.2d 625, 630 (1993).

## CONCLUSION

The majority opinion categorically prohibits competent, credible, and relevant evidence that directly addresses the elements and different degrees of the offenses with which Defendant was charged. Thus, it deprives Defendant of her right to due process under both the Arizona and United States Constitutions. Therefore, I respectfully dissent.