[Criminal No. 719. Filed April 6, 1931.]

[297 Pac. 1029.]

RICHARD N. BURROWS, Appellant, v. STATE, Respondent.

Mr. E. T. Cusick, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Arthur T. La Prade, Assistant Attorney General, and Mr. George T. Wilson, County Attorney, for the State.

LOCKWOOD, J.—Richard N. Burrows, hereinafter called defendant, on the seventh day of June, 1929, was informed against by the county attorney of Maricopa county for the crime of murder, alleged to have been committed April 26th, of that year. He was duly tried on such information, and the jury returned a verdict finding defendant guilty of murder in the first degree, fixing the penalty at death, and, from the judgment rendered on the verdict and the order overruling the motion for a new trial, this appeal has been taken. With the exception of two points, which we shall refer to in the course of this opinion, there is singularly little conflict in the evidence, and we therefore state the facts as follows:

Defendant, whose home was in Chicago, was a boy of eighteen or nineteen, and during the spring of 1929 was at a military school in Delafield, Wisconsin. His closest friend there was one Milton Drucker. The two boys apparently came to the conclusion they would leave school for the purpose of seeing the country, and, taking a car belonging to the Drucker boy's parents, started west. They were at that time in the possession of some fifty-five dollars in cash, while Drucker had a small amount of money in bank. After some days' travel they reached Phoenix and were there detained by the police at the request of Drucker's parents. The latter's mother came on from San Diego, where she had been staying, and took her son back to Chicago. Defendant asked permission to go back with them, but was informed by Mrs.

Drucker that his adopted parents had decided it would be a good lesson for him if he had to shift for himself and go to work, and that for that reason she would not take him. He was alone in Phoenix, unacquainted with anyone except the police who had had him in charge for a few days, and substantially, if not entirely, without money. He determined to try to get back to Chicago, and beat his way by railroad as far as Aguila, Arizona, where he discovered that he was on the way to Los Angeles instead of Chicago. He then decided to try to get back to Phoenix, where he had left a suitcase containing personal effects, and make a new start for Chicago, and seeing one Jack Martin, whom we shall hereafter call deceased, at a filling station in Aguila, and discovering the latter was going to Phoenix, asked if he might ride with him. Deceased answered affirmatively, and the two started to Phoenix in the latter's car.

Deceased was either carrying intoxicating liquor in his car, or secured some along the road, for by the time they reached Morristown, a small town some fifty miles northwest of Phoenix, he was so obviously intoxicated that the service station proprietor there suggested to the two that defendant had better drive, to which deceased assented. They left Morristown, and some few miles beyond it defendant shot and killed deceased, who was at that time sitting slumped down in the car in a drunken stupor. Defendant drove the car off the road to a small arroyo, and after taking what money deceased had on his person, placed the body in the arroyo and partially covered it with dirt, took the car, and went on to Phoenix, where he stopped at the police station and secured his personal effects. He then drove on to Denver, Colorado, where he was apprehended and brought back to Phoenix. This statement of the facts is based on defendant's own testimony, and in the absence of

anything further unquestionably establishes beyond the peradventure of a doubt a case of murder in the first degree.

The only defense offered at the trial was one of involuntary intoxication. Defendant testified that shortly after they left Aguila deceased began urging him to drink some beer which he was carrying in the car. Defendant had never tasted intoxicating liquor, and objected most strenuously, whereupon deceased became very abusive, stating that, if defendant would not drink he would put him out of the car. Defendant, being alone, penniless, and fearing that he might be ejected and left on the desert, did drink three or four bottles of the beer, and since he was unused to intoxicating liquor, and had had little to eat in the preceding twenty-four hours, began to feel very queer.

When the parties reached Wickenburg, deceased procured some whisky, and with increasing vehemence urged defendant to partake of that. At first the latter remonstrated, but finally, as he states, through fear of what deceased might do to him, did drink some whisky. He claimed that its effect was to make him sick at the stomach and dizzy, until he had very little idea of what was happening, and that at the time the shooting occurred he was so dazed that he was unable to realize what was happening until after the fatal shot was fired, when his mind cleared up and he did realize what he had done, and that his conduct thereafter was due to panic at realizing his situation, and an effort to escape from the consequences thereof.

There are some eight assignments of error which raise certain legal propositions which we shall discuss as seems advisable. The first is the question of the age of defendant at the time the killing occurred, and whether or not, in view of the record as presented to

us, the court committed prejudicial error in its treatment of that issue. It appears that defendant was apprehended some time in May, 1929, and returned to Phoenix. The information on which he was tried was filed June 7th. On the 4th of September, and for the first time during the progress of the proceedings, it was suggested to the Honorable M. T. PHELPS, in whose division of the superior court of Maricopa county the proceedings were pending, that defendant at the time of killing was under the age of eighteen years. The point was raised on a plea in abatement, made in a formal manner, and a continuance of sixty days was requested by defendant for the purpose of making a showing as to his age. The court denied the sixty days, but gave defendant up to the time of trial, which had been set for hearing on the 23d of September, for that purpose. No further proceedings were taken in the matter until the case was called for trial on the 23d of September, whereupon the defendant, through his counsel, presented the plea in abatement and asked for a ruling thereon.

The plea set up, in substance, the various proceedings which had been had in the case up to that time, and then alleged that the defendant *at the time of the killing* was under the age of eighteen years. There was considerable discussion in regard to the matter, and defendant demanded a jury trial on the issue of his age. The trial court denied this demand, and then made the following ruling:

"Gentlemen, let the record show that pursuant to the order of the Court entered on the 4th day of September, 1929, as shown by the corrected minutes of that date, and further, the question of the age of the defendant having been suggested to the Court both by motion for a continuance supported by an affidavit and also by a purported plea in abatement, the Court at this time will hear proof of the age of the defendant."

Defendant then, while expressly stating that he did not waive his plea in abatement and his right to a jury trial thereon, did offer evidence in regard to his age. No formal order was made suspending proceedings in the criminal case and remanding them to the juvenile court. What actually happened was that, after the ruling which we have just quoted, the jury was excused and the trial judge, sitting on the bench in the courtroom, proceeded to hear evidence as to defendant's age. Considerable testimony on this point was offered, part of which would sustain the view that defendant *at the time of the killing* of deceased was under the age of eighteen, and part of which would sustain a finding that at that time he was over that age. It was admitted by all parties that at the time the information was filed he was over eighteen years of age. The court then stated formally:

"Hence the Court finds, as a matter of fact, that the defendant is nineteen years of age and is subject to the jurisdiction of this Court on the trial of the charge now pending against him."

The first matter for us to determine is the meaning of the Arizona statutes governing criminal proceedings against children under the age of eighteen years. These statutes, so far as material for the determination of this case, read as follows:

"**1928. Superior courts exclusive jurisdiction; definition of terms; power of judges and officers.** The superior court shall have exclusive original jurisdiction in all proceedings and matters affecting neglected, incorrigible, or delinquent children, or children accused of crime under the age of eighteen years . . . 'delinquent child' shall mean a child under such age, including such as have heretofore been designated 'incorrigible children,' who may be charged with the violation of a law of this state or the ordinance of a town or city.

"The judges of said courts shall hold examinations in chambers of such children concerning whom pro-

ceedings are brought, in advance of any criminal prosecution of such children, and may suspend criminal prosecution for any offenses committed by such children. The records of the proceedings of such court for such purposes shall be kept in a docket separate from all other proceedings of said court. In the absence of a judge from his county, the court commissioner in such county shall have the power, and may make orders for the temporary care, custody and control of such child. The powers and -duties of the officers of court under proceedings provided for herein, shall be the same as in criminal actions.

"1929. . . . Whenever a child under the age of eighteen years is charged with the commission of a crime, or the violation of an ordinance, before a magistrate or justice of the peace, he shall certify that such child is charged with such crime or violation, and immediately transmit such certificate and all papers to the clerk of the superior court, and thereupon such superior court shall exercise jurisdiction thereof. When the jurisdiction of the court has attached the court may make all necessary orders for compelling the production of the child and the attendance of the parents and all persons having custody or control of the child. Pending a final disposition the child shall be subject to the order of the court, and may be permitted to remain in the control of its parents or person having it in charge or of the probation officer hereinafter provided for, or may be kept in some place provided by the state or county authorities, or by any association for the care of delinquent or neglected children." From sections 1928 and 1929, Revised Code of 1928.

It is the contention of defendant that these statutes apply to all children who may be under the age of eighteen years at the time the particular violation of law for which they are prosecuted is alleged to have occurred. The state insists, on the other hand, that the age of the child at the time when the information on which it is to be tried is filed should govern.

There are two lines of decisions upon this point. The first is best laid down in the case of *Ex parte Powell*, 6 Okl. Cr. 495, 120 Pac. 1022. The court there holds as follows:

"The Legislature in its wisdom by this law says that a child under 16 years of age *cannot be guilty of the commission of a crime, except in cases where it is shown that such child knew the wrongfulness of his acts at the time they were committed.* The acts committed by such child, which in an adult would be a crime, under this statute, constitute juvenile delinquency only, except in cases of a serious character, when the juvenile court is authorized by the act, *supra,* in its discretion, to cause such child to be proceeded against in accordance with the law that may be in force governing the commission of crime.

"Prior to the enactment of the law in question, the statutes provided:

" 'All persons are capable of committing crimes, except those belonging to the following classes: 1. Children under the age of seven years. 2. Children of the age of seven years, but under the age of fourteen years, in the absence of proof that at the time of committing the act or neglect charged against them, they knew its wrongfulness.' Section 2034, Snyder's Stats.

"*The juvenile court law under consideration, in effect, provides that children under the age of 16 are incapable of committing crime.* But, in order that no great wrong should be done to society, the Legislature took the precaution to provide that, a child being brought before the juvenile court on a charge of delinquency, such court might, in its discretion, cause such child to be proceeded against in accordance with the law governing the commission of crime. See section 3, par. 2, act, *supra.* This provision contemplates an investigation by the juvenile court of the acts complained of, with the view of determining whether or not the child committed them, and, if so, whether or not he knew the wrongfulness thereof in a criminal sense. And should the court find affirmatively, it is then within its discretion, under the law,

to hold such child to be proceeded with in the manner provided by law in a court having competent jurisdiction of the offense committed, certifying to such court both its finding as to probable cause, and that the child *knew the wrongfulness thereof.* The finding of the juvenile court, or the county judge sitting as such, that the child knew the wrongfulness of his act, and was capable of committing the offense, and did commit it, does not relieve the state of the burden of proving that the child knew the wrongfulness of his act at the time of the commission thereof, upon the trial before a jury in a court of competent jurisdiction, as provided in subdivision 2, § 2034, Snyder's Statutes. The effect the juvenile court law under consideration has on said subdivision *is simply to change the word 'fourteen' to 'sixteen,' subsequent to the foregoing proceedings.''* (Italics ours.)

The effect of the ruling is that the juvenile statute of the state of Oklahoma in effect changed the age over which one is presumed to have capacity to commit a crime from fourteen to sixteen years, and provided that, before a child under the statutory age could be tried for a crime, there must first be a determination of the juvenile court, not only of his age, but also of the fact that he knew the wrongfulness of the particular act in a criminal sense, and that, even if the court did so certify, and the child was tried before a jury as a criminal, the same issue must again be submitted to the jury. In the cases of *Mattingly* v. *Commonwealth,* 171 Ky. 222, 188 S. W. 370, and *State* v. *Dubray,* 121 Kan. 886, 250 Pac. 316, this rule finds support.

The Supreme Court of Texas had the same question before it, in the case of *Arrandell* v. *State,* 60 Tex. Cr. Rep. 350, 131 S. W. 1096. Therein, discussing the matter, they say:

"We think the proper construction to place upon this act is that the defendant shall not be entitled to the provisions of said act if he is over the age of 16

years at the time of the trial, and that it does not relate to the age of the party at the time of the commission of the offense; second, that whatever construction might be placed upon this act, a discretion is lodged in the district court to either try or transfer the case to the juvenile court, and this discretion could not be the subject of revision by this court, unless it was clearly shown that there was an abuse of that discretion, which question could hardly arise in this character of proceeding. We think that this would be a proper construction of this act; for, if we should hold otherwise, we would have the anomalous condition of sending a man to the juvenile court to be confined in the school for the training of children, and who at the time of the trial might be 40 or 50 years of age, on the ground that he was a juvenile at the time of the commission of the offense. It was never so intended by the lawmakers. *The object and purpose of this act,* together with the act of the same Legislature making provision for the commitment to state institutions for the training of juveniles, all persons under the age of 16 years, *was to remove children of tender years from the association of confirmed felons and bad characters, and place them under a training for the purpose of developing their character and fitting them for useful citizenship,* and it was never intended by said act to reach those cases where the man was over 16 years of age at the time of the trial.'' (Italics ours.)

In other words, the juvenile statute affected merely the treatment of the offender, and not his capacity for crime. What is the purpose of the juvenile statutes of Arizona? After a careful examination of the general principles back of the laws relating to juvenile offenders, and particularly of our statutes on that subject, we are of the opinion that so far, at least, as the juvenile law of Arizona is concerned, it affects the *treatment* and not the *capacity* of the offender. It will be noted that there is no provision whatever in our law, as there is in that of Oklahoma, requiring the judge to certify as to the capacity of the child,

nor indeed is there any reference to such capacity. The suspension of criminal proceedings is discretionary with the judge, no limitation of such power or cause for its exercise or nonexercise being even suggested in the statute. The general experience of mankind teaches us that the ordinary child of seventeen years of age, unless he be mentally deficient, has full capacity to distinguish between right and wrong. In the absence of a clear legislative mandate to the contrary, we cannot presume it meant to lay down an arbitrary rule in regard to criminal capacity so contrary to human experience. We hold, therefore, that the purpose of the Arizona juvenile law is not to attempt to establish an arbitrary age below which the child is presumed to be ignorant of the consequences of his acts, but rather to provide a special method of treatment for minors under the age of eighteen who have violated the criminal law, and, even with such children, leaving the application of the juvenile or criminal code to the discretion of the trial court.

The information on which defendant was tried was admittedly filed after he had reached the age of eighteen, and the issue of his age was not suggested until after the filing of such information. We are therefore of the opinion that it was immaterial as to whether the court proceeded in the manner set forth in the Juvenile Code to try such issue, for the admitted facts show the Juvenile Code did not apply. The first five assignments of error are therefore without merit.

The next assignment goes to the alleged error of the court in admitting a certain extrajudicial confession of defendant. The objection is made on two grounds: (1) That the *corpus delicti* had not been sufficiently established, and (2) that it did not appear the confession was a voluntary one. It is the ordinary rule of law that the confession of an accused

person is not sufficient to establish the *corpus delicti* of the offense. *Douglas* v. *State,* 26 Ariz. 327, 225 Pac. 335. In a murder case, therefore, the state must prove, *aliunde* the confession, that the person named in the information is dead, and that he has been killed by someone. Such evidence, of course, may be either direct or circumstantial, but must be clear and convincing to that effect. *State* v. *Castelli,* 92 Conn. 58, 101 Atl. 476; *Kugadt* v. *State,* 38 Tex. Cr. Rep. 681, 44 S. W. 989. In the present case the evidence presented to the jury before the confession in dispute was offered in evidence may be stated fairly as follows:

Jack Martin, the deceased named in the information, on the twenty-sixth day of April, 1929, left the home of his sister in Salome, Arizona. At this time he was wearing a light-colored silk shirt, light-colored shoes, a wrist watch, and a gold ring, and driving a Chevrolet cabriolet. At a later time that morning he was seen at the town of Aguila, where defendant got into the car with him. They were seen together in or near the car at Wickenburg, Morristown, and one or two service stations on the road between Aguila and Phoenix that same day. The last place where they were positively identified as being together was at Morristown. When they left that station Burrows was driving the car, and Martin was seated beside him. Four miles southeast of Morristown the proprietor of a service station saw Burrows driving the car, and some man, whom he could not identify, seated in the car with him. From that place and time Martin was never seen alive. About three weeks later a body was found lying face down in a small arroyo some distance from the highway, a little north of Beardsley, Arizona. Tracks of an automobile were found leading almost to the arroyo. The body was partially covered with dirt, and the sides of the

arroyo showed signs of having been broken down to secure the dirt with which it was covered. It was in such an advanced state of decomposition that it was impossible to perform an autopsy to determine the exact cause of death, or the identity of the person, but a ring found on it was positively identified as belonging to Martin, and as having been worn by him when he left his sister's home in Salome the morning of April 26th. The shoes were also positively identified as being those worn by Martin when he left his home in Phoenix to go to his sister's, and the clothes on the body were of the same general description as those worn by him when he left Salome. All these facts taken together, in our opinion, although circumstantial in their nature, were amply sufficient to establish the *corpus delicti.*

Was the proper foundation laid for the admission of the confession, as to its being voluntary? The state attempted to introduce a confession made by defendant in Denver, but this was ruled out. The one which was admitted was a statement made by defendant to his adopted father in the presence of the sheriff of Maricopa county, while the parties were on a train proceeding from Denver to Phoenix. The rule in regard to the admission of confessions in Arizona is laid down in the case of *Kermeen* v. *State,* 17 Ariz. 263, 151 Pac. 738, as follows:

"The rule of the admissibility of the confession is that:

" 'The court should determine, prior to permitting the confession to go to the jury, whether it was or was not voluntary.' 12 Cyc. 481, and note 20.

" 'The question whether a confession is free and voluntary is a preliminary one addressed to the trial court (*People* v. *Miller,* 135 Cal. 69, 67 Pac. 12), and that court is clothed with a considerable amount of discretion in determining it (*People* v. *Suesser,* 142 Cal. 354, 75 Pac. 1093). . . . ' *People* v. *Loper,* 159 Cal. 6, Ann. Cas. 1912B 1193, 112 Pac. 720.''

It is not necessary to recite in detail the evidence heard by the trial court in determining the admissibility of the confession. It is sufficient for us to say that we are of the opinion the court did not abuse its discretion in this particular and the confession was properly permitted to go to the jury.

The next assignment of error which we consider goes to the giving by the court of a certain instruction, and its failure to give another. The instruction complained of reads as follows:

"I further instruct you that if you find from all the evidence, after a careful consideration thereof, that the defendant prior to the commission of the act as alleged in the information drank intoxicating liquors, and that if the drinking of such intoxicating liquors was a result of (any influence) coercion and (or) abuse *by being compelled to drink against his will and consent* on part of the deceased or any other person, and if such acts on part of the deceased or any other person caused the defendant to drink the intoxicating liquor against his will and consent, and if you further find that as a result of the drinking of such intoxicating liquor the defendant became intoxicated to the extent that his reason was destroyed, and that at the time he committed the act as alleged in the information he did not know the consequences thereof, then in that event I instruct that it is your duty to return the verdict of not guilty. *And in this connection, gentlemen, I wish to state to you that the statement here is the test of whether or not there is an excuse for the commission of an act because of intoxication, and that test is, was the defendant intoxicated to the extent that his reason was destroyed, that he did not understand and appreciate the consequences of his act?*

"I further instruct you that the law recognizes the defense of involuntary intoxication, and that involuntary intoxication as termed in these instructions, means the drinking of intoxicating liquor against the will and consent of the person so intoxicated, and to constitute such involuntary intoxication it is not

necessary that the liquor be consumed by the defendant as a result of physical force or violence applied by any other person, but it means the consumption of intoxicating liquor (by any influence) coercion *and abuse by compelling the defendant to drink against his will and consent,* or by any acts of another person so consuming such intoxicating liquor, to the extent that such person drink said liquor against his will and consent.''

This instruction is similar to one requested by defendant, except that the court struck out the words here given in parenthesis, and added those italicized. The one denied by the court uses the following language:

"If you find from the evidence in this case that the defendant drank intoxicating liquor supplied him by the deceased, and if you find that the defendant drank such intoxicating liquor at the suggestion, coercion, abuse and influence of the deceased, then it is your duty to take into consideration the youth and inexperience of the defendant and all the facts and circumstances surrounding the defendant at the time of the drinking of such intoxicating liquor, for the purpose of determining whether or not said intoxicating liquor was consumed by the defendant against his will and consent.''

The real issue involved is as to the manner in which involuntary intoxication must be induced, and the extent to which it must go. So far as the last point is concerned, we are of the opinion that the intoxication must be sufficient to affect the reason of a defendant to the extent that he does not understand and appreciate the nature and consequences of his act, or, as is commonly said, that he does not know right from wrong. 16 C. J. 108, 109, and note.

The other point is more difficult. It is the contention of defendant that any suggestion or influence which induces another to become intoxicated, when, if he had been left entirely to himself, he would have

remained sober, excuses him from the consequences of a crime. It is the theory of the state that the influence must go to the extent of actual coercion and abuse. While this precise point has never been decided by any court, so far as the matter has been called to our attention, we are of the opinion that the true rule is that the influence exercised on the mind of a defendant must be such as to amount to duress or fraud. The law has always jealously guarded the effect of drunkenness as a defense in criminal cases, and, even with all the restrictions surrounding it, the doctrine is a dangerous one, and liable to be abused. *Johnson* v. *Commonwealth,* 135 Va. 524, 30 A. L. R. 755, and notes, 115 S. E. 673. In this case there is no suggestion of fraud, and it was for the jury to decide whether or not there was coercion and abuse to the extent of duress. While the instruction was not, perhaps, as happily worded as it might have been, we are of the opinion that the jury was correctly informed as to the true rule in regard to a defense of involuntary intoxication; that (1) it must be induced by acts amounting in effect to duress; and that (2) it must go to such an extent that the mind of the defendant was incapable of understanding the criminal nature of his act.

The seventh assignment of error is that the county attorney was guilty of misconduct in his argument to the jury. We quote in full from the transcript the portions of the argument to which defendant excepts:

"Mr. Wilson (County Attorney): We have had many of these murders on the highways of Arizona, and they all have the same earmarks.

"Mr. Speakman (Counsel for defendant): I object to that, and assign it as misconduct on the part of the County Attorney.

"The Court: Yes.

"Mr. Wilson: Will the Court instruct the jury to disregard the remarks, then?

"The Court: The jury are instructed to disregard the remarks. . . .

"Mr. Wilson: You will do the same as another state did when two young murderers came in and pleaded guilty to first-degree murder and they were given life imprisonment. And that was in the same state that this defendant comes from.

"Mr. Speakman: To which the defendant also objects as misconduct on the part of the County Attorney, and I would like for the Reporter to take his remarks.

"Mr. Wilson: Are you going to charge the jury?

"The Court: Yes, the jury are instructed to totally disregard it."

The reason that remarks of this nature are held to be erroneous is that a defendant is entitled to be tried only for the offense with which he is charged, and on the law and evidence legally germane to that offense, and that only. References, therefore, to anything not legally admissible against the defendant in the particular case and which would tend to call the attention of the jury to other crimes in a manner which might prejudice them against defendant are always improper, generally erroneous, and sometimes of a gravity sufficient to reverse the case.

It will be noted that the court instructed the jury to disregard totally both of the remarks made by the county attorney. Ordinarily such action by the trial court is held to cure errors of this nature. But in capital cases appellate courts are prone to scrutinize them more carefully, for the reason that it is almost impossible to eliminate fully their effect on the jury. It is urged by defendant that the first remark to the effect that "we have had many of these murders on the highways of Arizona, and they all have the same earmarks" recalled to the minds of the jury two particularly atrocious murders which occurred some years previously in the state of Arizona. We see nothing in the remark that would single out the

two particular murders referred to by counsel for defendant, and doubt if a single member of the jury recalled either case, the circumstances thereof, or the name of the defendant. If it be taken as merely referring to the fact that there have been a number of so-called "hitch-hike murders" committed in Arizona, this is a fact of such common notoriety that we must presume it is known by the ordinary intelligent inhabitant of Arizona, and that the jurors, in all probability, recalled that fact without having been reminded of it by the county attorney. We are of the opinion, therefore, that, although the remark was improper, it was not so prejudicial that the admonition of the court given to the jury to disregard it would not cure the error.

The second remark was far more serious. It was that:

"You will do the same as another state did when two young murderers came in and pleaded guilty of first-degree murder; and they were given life imprisonment. And that was in the same state that this defendant comes from."

This was undoubtedly a reference to the famous Leopold-Loeb case, which occurred some years since in the state of Illinois. The case is of such widespread notoriety that we should assume some, at least, of the jury had it recalled to their minds by the remark of the county attorney.

That the language used by the county attorney was in the highest degree improper, utterly indefensible, and deserving of the severest censure, is obvious to every man who recalls the case referred to, and its circumstances. While it is true the evidence in this case is of such a nature that no reasonable jury, whether the objectionable remark had been made or not, could have returned any other verdict than murder in the first degree, yet in our opinion it was not

only objectionable, but in the highest degree prejudicial so far as the penalty was concerned. Under our law the legislature, believing that two murders legally of the same degree may differ greatly in the moral atrocity of the crime, has provided that the jury may in its discretion direct that the defendant suffer the extreme penalty of death, or, if there appear extenuating circumstances, may provide for life imprisonment. In our opinion the present case is peculiarly one where reasonable jurors might differ as to the proper penalty, though there could be no difference on the general verdict.

On the one hand is the natural feeling of indignation at the ingratitude shown where the murderer has gained his opportunity for the killing through the kindness of his victim. On the other hand we have a boy, barely over the age of eighteen, of good previous character, and brought up in a sheltered home, suddenly, as he believed, abandoned by his parents, penniless, friendless, and hungry; a stranger in a strange land, and perhaps with his moral resistance weakened by the unwonted use of liquor urged on him by his victim. While this is, of course, no legal justification or excuse for his acts, a jury might well, in view of the situation, have deemed life imprisonment a sufficient penalty. Under such circumstances the county attorney calls to their attention a case, similar only in the fact that the defendants therein were youths, and lacking in every other mitigating circumstance found in the case at bar. In that case, as every juror at all familiar with it knew, a storm of indignation beat upon the head of the judge who had failed to assess the death penalty. The only inference which the jury could possibly have drawn from the remarks of the county attorney was a threat that, if they failed to return a verdict carrying the graver

penalty, they would be criticised as was the judge in the Leopold-Loeb case.

The provisions of article 6, section 22, of our Constitution cover many errors, but there is a limit beyond which they cannot be stretched, and in this case we believe that limit has been passed. Much as we regret the imposition upon the taxpayers of Maricopa county of the burden of another trial of this case, it is too dangerous to the administration of justice to allow such conduct to pass unchallenged.

Because of the necessarily prejudicial remarks of the county attorney above discussed, the judgment is reversed, and the case remanded to the superior court of Maricopa county for a new trial.

McALISTER, C. J., and ROSS, J., concur.