38 P.3d 1236

**STATE of Arizona, Appellee,**

v.

**Gary Martin McKEON, Appellant.**

**No. 1 CA–CR 00–0297.**

Court of Appeals of Arizona, Division 1, Department D.

Jan. 24, 2002.

Janet Napolitano, Attorney General By Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and John L. Saccoman, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James Haas, Maricopa County Public Defender, By James H. Kemper, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

FIDEL, Judge.

¶ 1 Appellant Gary Martin McKeon, convicted of two counts of first-degree murder and one count of first-degree burglary, claims on appeal that the trial court erred in instructing the jury that his asserted intoxication from the use of prescribed medication was "not a defense for any criminal act or requisite state of mind."

¶ 2 The trial court, in our opinion, improperly stated the law because involuntary intoxication, when it arises from the non-abusive use of prescribed medication, may be relevant to the question whether a person accused of a criminal act had the requisite state of mind. We affirm McKeon's conviction and sentence, however, after finding the error harmless in the context of the evidence.

## BACKGROUND

¶ 3 In the fall of 1996, after McKeon's wife, Kerry, left him and their children, McKeon became acutely depressed. His depression subsided somewhat when his psychiatrist prescribed Zoloft, an anti-depressant, and Klonopin, an anti-anxiety medication. McKeon attempted a reconciliation, but Kerry divorced him and married George Hild in the summer of 1997.

·¶ 4 On August 16, 1997, McKeon killed Kerry and George at the home of Kerry's sister and brother-in-law. The next day, he turned himself in to the police.

¶ 5 Tried before a jury, McKeon defended in part on the ground that a combination of prescribed medications had rendered him unaware of his actions. He testified that on the day of the shootings, he had taken Zoloft and Klonopin, drugs prescribed by his psychiatrist, and Roxicet, a pain medication prescribed for complications from a hernia operation. He also testified that, with the exception of "little snippets or Polaroids or whatever of my memory," he could not remember where he was, what he did, or whom he was with that day. These "snippets," which McKeon described as things that his memory "told," "said," or "would have said" to him, included little more than being in his former in-laws' backyard, "seeing [George] pull a gun and shoot at me," and shooting back. McKeon also testified that he decided to turn himself in when a television news broadcast caused him to realize what had occurred.

¶ 6 According to the testimony of three medical witnesses, including McKeon's psychiatrist, McKeon's medications in combination could cause delirium or severe cognitive impairment. The medical witnesses also testified that McKeon's medications should be taken regularly. McKeon admitted that he took the medications only intermittently but testified that he had not been advised that he must take them regularly.

¶ 7 At the close of evidence, the trial court gave the jury the following instruction:

Temporary intoxication resulting from the voluntary ingestion or consumption of Zoloft, Klonopin, or Roxicet, or any other drug is not a defense for any criminal act or requisite state of mind; nor is the abuse of any prescribed medication. Requisite state of mind includes intentionally, knowingly, premeditation, or with intent to.

You may not consider any evidence of defendant's drug use in determining whether he acted intentionally, knowingly, or with premeditation.

¶ 8 The jury returned guilty verdicts on two counts of first-degree murder, for which the trial court sentenced McKeon to consecutive terms of incarceration for his natural life. The jury also found him guilty of one count of first-degree burglary, for which the trial court sentenced him to prison for seven and one-half years, to be served concurrently with the first of his two natural life terms. McKeon timely appealed.

¶ 9 We independently review whether a trial court has properly instructed the jury on the law. *State v. Orendain,* 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997). When a jury instruction has incorrectly stated the law, we consider whether the error was harmless. Error is harmless if we can conclude beyond a reasonable doubt that it did not influence the verdict. *State v. Rodriguez,* 192 Ariz. 58, 63, ¶ 27, 961 P.2d 1006, 1011 (1998).

### INTOXICATION DUE TO PRESCRIBED MEDICATION

¶ 10 In 1993, the legislature changed the law regarding the defense of voluntary intoxication. *See* 1993 Ariz. Sess. Laws, ch. 256, § 3. Before this change, the law read:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

A.R.S. § 13–503 (1989).

¶ 11 Section 13–503 now reads:

Temporary intoxication resulting from the voluntary ingestion, consumption, inhalation or injection of alcohol, an illegal substance under chapter 34 of this title or other psychoactive substances *or the abuse of prescribed medications* does not constitute insanity and is not a defense for any criminal act or requisite state of mind.

A.R.S. § 13–503 (2001) (emphasis added).

¶ 12 Despite substantial differences, each version of the statute addresses intoxication resulting from the consumption of prescribed medications, and each, by different means, implicitly distinguishes between medically authorized consumption and misuse.

¶ 13 Before the 1993 amendment, the 1989 version of § 13–503 addressed these subjects in conjunction with a related definitional statute. Section 13–503 itself provided, as we have indicated, that an act was not less criminal by reason of having been committed "in a state of voluntary intoxication." "Voluntary intoxication" was defined as "intoxication caused by the knowing use of drugs, toxic vapors or intoxicating liquors by a person, the tendency of which to cause intoxication the person knows or ought to know, *unless the person introduces them pursuant to medical advice* or under such duress as would afford a defense to an offense." A.R.S. § 13–105(38) (emphasis added). By reasonable implication, the *abusive* consumption of prescription medication would not qualify as consumption "pursuant to medical advice." Thus, the two statutes, read in tandem, excluded intoxication arising from the *non-abusive* use of prescription drugs from the definition of voluntary intoxication and permitted a defendant to assert such a state as one of *involuntary* intoxication that might be considered to negate the requisite state of mind for committing a crime.

¶ 14 The more recent version of § 13–503 approaches the subject of prescription medication from a different angle, but arrives at the same end. It provides that temporary

intoxication is not a defense for a criminal act or requisite state of mind if it results from the *abuse* of prescribed medications. The statute by implication does not preclude a criminal defendant from asserting temporary intoxication arising from the *non-abusive* use of prescription medication—a use pursuant to medical advice—to negate a requisite state of mind.

¶ 15 Before settling on this interpretation, we address an ambiguity that arises from the differential use of overlapping categories in § 13–503. The statute, as now worded, speaks preclusively of temporary intoxication that results from the voluntary consumption of "an illegal substance ... or other psychoactive substances or the abuse of prescribed medications." The statute uses the qualifying words "abuse of" to narrow its provision concerning prescribed medications but does not use these qualifying words to narrow its provision concerning psychoactive substances. Yet "prescribed medications" include some "psycho-active substances." A "psychoactive" substance is one "affecting the mind or behavior." Webster's Ninth New Collegiate Dictionary (1985). And some prescription drugs obviously have that purpose and effect.

¶ 16 The question thus arises whether (1) the consumption of a prescription drug, if also a psychoactive drug, is statutorily precluded as a basis for a defense without regard to whether the prescription was properly taken or abused, or (2) whether the consumption of a psychoactive drug, if pursuant to medical prescription, is only precluded as a basis for a defense if the prescription drug was abused.

¶ 17 In our view, the second interpretation gives meaning and purpose to the statute. This is so because the statute applies *only* to substances that have a capacity to induce a state of temporary intoxication. Thus, any prescribed medication that could fall within the scope of the statute must

necessarily have such a capacity, and any medication with the capacity to induce a state of temporary intoxication is by definition a psychoactive substance, one that can affect the mind or behavior. To hold that a defense may not arise from the consumption of a prescribed psychoactive medication, even one properly taken and not abused, would render superfluous the statutory provision regarding the abuse of prescription medication. Whenever possible, we construe statutes so as not to render any clause, sentence, or word superfluous. *State v. Johnson*, 171 Ariz. 39, 42, 827 P.2d 1134, 1137 (App.1992). The legislature plainly sought to distinguish abuse of prescribed medication from the proper, non-abusive consumption of such medication pursuant to medical advice. We can only give meaning to this distinction by concluding that the legislature intended by its reference to prescribed medications to encompass all forms of prescribed medications, including those with psychoactive properties, and that the legislature intended by its reference to "other psychoactive substances" to include those that are neither illegal substances nor prescribed medications.

¶ 18 Although we interpret our statute by reference to its terms, other jurisdictions have characterized intoxication resulting from the proper use of prescribed medication as involuntary intoxication and recognized it as a defense to criminal charges. *See* Phillip E. Hassman, Annotation, *When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge*, 73 A.L.R.3d 195 (1976); *State v. Gardner*, 870 P.2d 900, 902 (Utah 1993) (murder defendant who presented evidence of intoxication resulting from use of prescription anti-depressant, Prozac, was entitled to instruction on involuntary intoxication); *Brancaccio v. State*, 698 So.2d 597, 600 (Fla.Dist.Ct.App.1997) (murder defendant who presented evidence of intoxication resulting from use of Zoloft entitled to involuntary intoxication instruction).[1]

---

1. Indeed, the categories of voluntary and involuntary intoxication have been historically distinct. In *Montana v. Egelhoff*, 518 U.S. 37, 51, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), the Supreme Court held that the affirmative defense of voluntary intoxication is not a fundamental principle of justice and may be abrogated without violating the federal Due Process Clause. The Court based its holding on the historical practice of English common law. "By the laws of England, ... the intoxicated defendant 'shall have no privilege by this voluntary contracted

¶ 19 Our legislature has recognized that the performance of a voluntary act is a minimum requirement for criminal liability. *See* A.R.S. § 13–201. This principle has been codified in Arizona since 1901. *See* Revised Statutes of Arizona Territory, Penal Code § 24(5), (6) (1901) (exempting from criminal liability "[p]ersons who committed the act charged without being conscious thereof" and "[p]ersons who committed the act or omission charged through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence").

¶ 20 In summary, we hold that A.R.S. § 13–503 does not preclude the assertion of temporary intoxication arising from the non-abusive use of prescription medication to negate the requisite state of mind for a criminal act. We adopt this holding because the statute refers preclusively to intoxication resulting from the *abuse* of prescribed medications, and to punish for an involuntary act would offend a fundamental principle of justice well recognized in Arizona.[2]

¶ 21 We thus conclude that the trial court's instruction misstated the law, and we turn to the question whether the error was conse-

quential. Specifically, we consider whether the evidence *permitted* the conclusion that McKeon lacked the requisite state of mind as a consequence of temporary intoxication arising from the non-abusive consumption of prescribed medication. *See State v. Averyt,* 179 Ariz. 123, 130, 876 P.2d 1158, 1165 (App.1994) ("Preventing the jury from considering evidence which might negate the *mens rea* of the crime would seriously undermine the protections embodied within the sixth amendment's jury trial provision.").

### HARMLESS ERROR

¶ 22 The State contends that even if the trial court's instruction misstated the law of temporary intoxication, the misstatement was inconsequential because the trial court found that McKeon's intermittent use of his medications was abusive. The record, however, contains no such finding.[3] Moreover, because the question of abuse of medications turned on the resolution of disputed facts and inferences, the question was one within the province of the jury, not the trial court, to resolve. *See, e.g., State v. Neal,* 143

---

madness, but shall have the same judgment as if he were in his right senses.' " *Id.* at 44, 116 S.Ct. 2013 (quoting 1 Hale, *Pleas of the Crown* 32). Involuntary intoxication, in contrast, was a well-recognized affirmative defense at common law. *See, e.g., City of Minneapolis v. Altimus,* 306 Minn. 462, 238 N.W.2d 851, 855–56 (1976) (quoting Hale, *supra*) ("That if a person by the unskilfulness of his physician, or by the contrivance of his enemies, eat or drink such a thing as causeth such a temporary or permanent phrenzy, as aconitum or nux vomica, this puts him into the same condition, in reference to crimes, as any other phrenzy, and equally excuseth him."). This differential treatment arises from the fundamental principle that one may be punished only for the results of one's voluntary acts or omissions. " '[I]f a person that is drunk kills another, this shall be Felony, and he shall be hanged for it, and yet he did it through Ignorance, for when he was drunk he had no Understanding nor Memory; but inasmuch as that Ignorance was occasioned by his own Act and Folly, and he might have avoided it, he shall not be privileged thereby.' " *Egelhoff,* 518 U.S. at 45, 116 S.Ct. 2013 (quoting *Reniger v. Fogossa,* 1 Plowd. 1, 19, 75 Eng. Rep. 1, 31 (1550)) (emphasis omitted).

**2.** Judge Hall states in concurrence that our conclusion is inconsistent with A.R.S. § 13–103(A) and *State v. Mott,* 187 Ariz. 536, 931 P.2d 1046

(1997), but we find no inconsistency. In § 13–103(A), the legislature abolished common law affirmative defenses, but it neither abolished the State's burden of proving that a defendant possessed the requisite state of mind at the time of the offense, nor abolished the defendant's opportunity to introduce evidence to counter the State's evidence of requisite state of mind. And in *Mott,* the supreme court declined to allow psychiatric testimony to establish that a defendant's mental capacity was too diminished, as a result of a *mental disorder,* to form the requisite mental state. The court stated, "Arizona does not allow evidence of a defendant's mental disorder short of insanity . . . to negate the *mens rea* element of a crime." 187 Ariz. at 541, 931 P.2d at 1051. *Mott* did not address, however, whether a defendant may attempt to negate the element of culpable mental state by demonstrating involuntary intoxication resulting from the proper use of prescription drugs. Thus, it does not resolve the question presented here.

**3.** In support of its assertion, the State cites the transcript of the hearing at which counsel settled jury instructions with the court. Though the court raised the issue at that hearing and took it under advisement, the record contains no indication that the court made a later finding that McKeon abused the drugs that he had been prescribed.

Ariz. 93, 97, 692 P.2d 272, 276 (1984) (holding that defendant's truthfulness and the credibility of and weight to be given expert medical testimony are issues of fact for jury).

¶ 23 The question remains, however, whether the jury, if permitted to consider the subject of temporary intoxication resulting from the ingestion of McKeon's medicines, might reasonably have found that McKeon was so intoxicated from his medication that he lacked the requisite state of mind to be guilty of the crimes with which he was charged.

¶ 24 We answer that question in the negative. If not precluded by the court's instruction from considering the subject, the jury might have concluded from McKeon's testimony and from that of Drs. Parker, Best, and Miller, that at the time of the shootings McKeon was experiencing some cognitive impairment, but the jury could not have reasonably concluded that McKeon was sufficiently deprived of his reason that he did not intend the natural results of his actions.

¶ 25 Dr. Parker testified that the combination of Roxicet and Klonopin could cause delirium, a state of mind that "changes rapidly" and is defined as "brain failure." Dr. Best confirmed that the combination of Zoloft, Klonopin, and Roxicet might induce delirium. Dr. Best testified that a possible side effect of both Zoloft and Klonopin is "cognitive impairment," the altering of a person's ability to know "person, place, [and] time." Indeed, Klonopin alone, she testified, may cause "severe" cognitive impairment. Dr. Miller testified that delirious persons "generally [are] not competent and tend not to know what they're doing." Dr. Miller further testified regarding delirious persons that:

> [I]f they have a gun, they might shoot themselves in the head. They couldn't carry out a carefully calculated plan to enter this building with a gun and do all kinds of things and get somebody.... But a simple thing, they could do, like shoot themselves in the head, and they might not know what they're doing.

¶ 26 McKeon's testimony, if accepted by the jury, might establish an altered ability to know person, place, and time. *See supra* ¶ 5.

Overall, however, the evidence is contrary to Dr. Miller's description of delirium, for McKeon did not engage at the time of the murders in a "simple" act. Instead, as he hunted down, cornered, and killed his ex-wife and her husband, he carefully executed a complex series of acts, some of which he had forecast in multiple prior threats.

¶ 27 McKeon telephoned his ex-in-laws' house and warned them that he intended to kill George and Kerry. He collected weapons and ammunition, which he had stored and hidden in various locations throughout his house. He drove nine miles from his house to the scene of the shootings. He reached over and opened a six-foot tall gate that was latched with a pin. He walked along a side yard and approached George and Kerry, who were on her sister's back patio. He repeatedly shot George, who had retreated with Kerry to the far corner of the backyard. At some point during the melee, he shot Kerry. And before departing, he climbed over or around a three-foot tall wrought iron fence and, at close range, fatally shot George in the face. He then ran back to his car and drove away, "burning rubber" as he left.

¶ 28 When McKeon shot George in the face, he accomplished precisely what he had long been threatening to do. One of George's former co-workers testified that sometime around the end of 1996, McKeon had threatened to "blow George's head off." Kerry's sister testified that at about the time the divorce was final, McKeon told her that "[h]e was going to shoot [George] between the eyes." Kerry's brother-in-law testified that eight days before the shootings, McKeon had told him that he would "right in front of Kerry ... blow George's brains away." McKeon also telephoned his ex-in-laws several times shortly before the shootings. During one of these conversations he again threatened to "put a bullet through George's head."

¶ 29 McKeon made good on his threat to shoot George between the eyes. Dr. Philip Keen, the Maricopa County medical examiner, testified that George received non-fatal gunshot wounds to the left hand, arms, back,

hip, and abdomen, and a fatal gunshot wound that entered between George's left eye and the left side of his nose. Dr. Keen further testified that gunpowder burns indicated that the fatal shot was fired from "within a couple of feet" from George's face. His other wounds, which were not inflicted from such close range, did not cause gunpowder burns.

¶ 30 In short, the evidence establishes that McKeon's actions were systematic and deliberate before the shootings, during the shootings, and during his flight. Given the deliberateness of McKeon's conduct, we are satisfied beyond a reasonable doubt that the trial court did not affect the verdict by erroneously instructing the jury regarding prescription drug-related intoxication. Had the jury been properly instructed on the subject, it could not have reasonably found that, at the time of the shootings, McKeon was so cognitively impaired that he did not know what he was doing or did not intend the natural consequences of his acts. Thus, the jury could not have found that, due to intoxication, McKeon lacked the requisite intent required for a first-degree burglary or first-degree murder conviction. *See* A.R.S. §§ 13–1508 and 1506 (a person commits first-degree burglary by entering or remaining within a fenced residential yard with the intent to commit a felony and possesses a deadly weapon); A.R.S. § 13–1105 (a person commits first-degree murder by knowingly or intentionally killing another with premeditation, or by killing another during the commission of burglary); *see also State v. Jamison*, 110 Ariz. 245, 248, 517 P.2d 1241, 1244 (1974) (lack of knowledge may disprove intent), *overruled on other grounds by State v. Mikels*, 118 Ariz. 495, 578 P.2d 174 (1978).

### CONCLUSION

¶ 31 The trial court's jury instruction on temporary intoxication misstated the statutory standard. An erroneous instruction is harmless, however, if we can conclude beyond a reasonable doubt that it did not affect the verdicts. *See Rodriguez*, 192 Ariz. at 63, ¶ 27, 961 P.2d at 1011. Because we draw

that conclusion in this case, McKeon's convictions and sentences are affirmed.

CONCURRING: WILLIAM F. GARBARINO, Judge.

HALL, Judge concurring:

¶ 32 The trial court's instruction regarding intoxication prevented McKeon from asserting involuntary intoxication as a defense for any requisite state of mind. Because the instruction correctly states the law in Arizona, the giving of it was not error.

¶ 33 The majority construes A.R.S. § 13–503 as impliedly creating a state of mind defense based on temporary intoxication caused by non-abusive use of prescription medication. To reach this result, my colleagues use a three-step approach. First, they note that § 13–503 does not, by its terms, specifically prohibit a defendant from asserting a temporary intoxication defense arising from the non-abusive consumption of prescription medication, which may include psychoactive substances. *Supra*, ¶ 14. Second, they equate an act committed while involuntarily intoxicated with one involuntarily committed and argue that punishing such an act would offend a fundamental principle of justice. *Supra*, ¶ 20. Third, they conclude, therefore, that § 13–503 must be read as permitting a defendant to urge the lack of a culpable mental state resulting from the proper use of prescription drugs. *Supra*, ¶ 21.

¶ 34 Although I agree with the majority that the effect of the 1993 change to A.R.S. § 13–503 was to eliminate temporary intoxication resulting from the voluntary ingestion of alcohol or drugs or the abuse of prescribed medications as a defense for any crime or requisite state of mind for that crime, I respectfully disagree with its conclusion that the current version of § 13–503 implies the existence of an involuntary intoxication defense.

¶ 35 At common law, voluntary intoxication was never a defense to a criminal charge. *City of Minneapolis v. Altimus*, 306 Minn. 462, 238 N.W.2d 851, 855 (1976) (quoting *Pearson's Case*, 168 Eng. Rep. 1108, 2 Lew. Cr.Cas. 144, 145 (1835) ("Voluntary drunken-

ness is no excuse for crime.")). Involuntary intoxication, however, was considered a defense to criminal liability if it caused the defendant to become temporarily insane. *City of Minneapolis*, 238 N.W.2d at 855. The non-abusive consumption of prescription medication has long been treated as a form of involuntary intoxication. *See generally* Hassman, *supra* ¶ 18.

¶ 36 The common-law rule that involuntary intoxication is a defense only when it renders the defendant temporarily insane is still followed by many states today. *See, e.g., City of Minneapolis*, 238 N.W.2d at 857 ("The numerous cases ... in which the common-law defense of involuntary intoxication has been recognized are virtually unanimous in holding that this defense is available only when the defendant is legally insane."); *Saldiveri v. State*, 217 Md. 412, 143 A.2d 70, 77 (1958) (court assumes that involuntary intoxication is a defense only if the degree of intoxication amounts to insanity); *State v. Gardner*, 870 P.2d 900, 902 (Utah 1993) ("[T]he standard for involuntary intoxication is the same as that for insanity."); *People v. Wilkins*, 184 Mich.App. 443, 459 N.W.2d 57, 60 (1990) ("[I]nvoluntary intoxication is a defense included within the ambit of the insanity defense."). The rationale for limiting involuntary intoxication as a defense coextensive with that of insanity is that it merely "establishes only that [the] derangement is without culpability and hence is to be dealt with the same as if it were the result of mental disease or defect." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 1005 (3d ed.1982).

¶ 37 By the end of the nineteenth century, the severe common-law rule precluding a jury from considering voluntary intoxication as a defense to crime was ameliorated in most jurisdictions by judicial development—and eventually, statutory adoption—of an exception that allowed a defendant to introduce evidence of voluntary intoxication to show that he lacked the specific intent necessary to commit a particular offense or degree of offense. *Montana v. Egelhoff*, 518 U.S. 37, 47, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). As a parallel development in some of these jurisdictions, defendants were permitted to

assert involuntary intoxication not only as an excuse under the insanity defense but also to negate specific intent. *See, e.g., State v. Mriglot*, 88 Wash.2d 573, 564 P.2d 784, 786 (1977) ("If a defendant is so intoxicated (voluntarily or involuntarily) as to be unable to form the requisite intent, he cannot be guilty of a specific intent crime. He need not prove temporary insanity simply because the intoxication happened to be involuntary.").

¶ 38 No previous case in Arizona addresses the precise question whether the use of an involuntary intoxication defense in Arizona is restricted to claims of temporary insanity or may also be raised to negate the requisite mental state in what formerly were called specific intent crimes. It is clear, however, that Arizona followed the common-law rule that permitted involuntary intoxication to be raised in the context of the insanity defense. In *Territory v. Davis*, 2 Ariz. 59, 10 P. 359 (1886), the defendant contended, and the Supreme Court of the Territory of Arizona agreed, that the jury should have been allowed to consider testimony that his mind had become weakened from a "continuous use of ardent spirits" and that, at the time he shot the deceased in the streets of Tombstone, he was suffering from an attack of delirium tremens resulting in a state of insanity. In *Burrows v. State*, 38 Ariz. 99, 297 P. 1029 (1931), *overruled on other grounds*, *State v. Hernandez*, 83 Ariz. 279, 320 P.2d 467 (1958), the defendant claimed that he had become intoxicated after drinking alcohol at the insistence of the victim and then shot him while in a "daze[ ]." *Id.* at 104, 297 P. at 1031. Paraphrasing the insanity formulation commonly referred to as M'Naghten's Rule, for *The Queen v. M'Naghten*, 4 St.Tr. (N.S.) 847 (1843), our supreme court articulated the "true rule" regarding the degree to which involuntary intoxication must incapacitate a person to be used as a defense in a criminal case:

> [W]e are of the opinion that [involuntary] intoxication must be sufficient to affect the reason of a defendant to the extent that he does not understand and appreciate the nature and consequences of his act, or, as is commonly said, that he does not know right from wrong.

*Id.* at 115, 297 P. at 1035. On the other hand, temporary mental incapacity caused by voluntary alcohol or drug intoxication has consistently been found insufficient to constitute insanity. *See, e.g., State v. Cooper,* 111 Ariz. 332, 334, 529 P.2d 231, 233 (1974); *State v. Dante,* 25 Ariz.App. 150, 153, 541 P.2d 941, 944 (1975), *overruled on other grounds, State v. Hunter,* 136 Ariz. 45, 664 P.2d 195 (1983).

¶ 39 In its analysis, the majority focuses on what it characterizes as an "amendment" to § 13–503 in 1993. *Supra,* ¶ 13. However, the previous version was not simply amended but was repealed as part of a comprehensive revision of Arizona's insanity statutes. 1993 Ariz. Sess. Laws, ch. 256. Both of the then-existing statutes regarding the insanity test (A.R.S. § 13–502 (1978)) and voluntary intoxication (A.R.S. § 13–503 (1989)) were repealed. *See id.* § 2. The legislature added a new § 13–502 that, among other changes, deleted previous language that allowed an insanity defense to be based on a defect of reason such that the person did not know the nature and quality of the act[4] and codified the existing case law by excluding from the definition of a mental disease or defect "disorders that result from acute voluntary intoxication or withdrawal from … drugs." *See id.* § 3. The legislature also significantly changed Arizona law regarding temporary intoxication by replacing the previous version of A.R.S. § 13–503[5] with the current version providing that voluntary temporary intoxication "does not constitute insanity and is not a defense for any criminal act or requisite state of mind." *Id.* Clearly, § 13–502 impliedly permits an insanity defense based on

involuntary intoxication and § 13–503 precludes voluntary intoxication from being used as either an insanity or state of mind defense.

¶ 40 Nonetheless, in the ashes of a statute that completely abrogates temporary voluntary intoxication as a defense, the majority finds an uncharred remnant of an involuntary intoxication defense that exists separate and apart from the insanity defense. If the previous version of § 13–503 had not been repealed and was still in effect, the majority's construction might be plausible. *Cf. Mriglot,* 564 P.2d at 785–86. As it is, I believe the majority has exceeded the court's proper role by judicially creating an affirmative defense. *See State v. Bohannan,* 101 Ariz. 520, 524, 421 P.2d 877, 881 (1967) ("Courts will not read into a statute something which is not within the manifest intent of the legislature as gathered from the statute itself."); *see also* A.R.S. § 13–103(A) (1997) ("All common law … affirmative defenses are abolished. No conduct constitutes … an affirmative defense unless it is … an affirmative defense under this title or under another statute or ordinance.").

¶ 41 Further, the majority fundamentally misapprehends the law when it implies that preventing a defendant from asserting that he lacked a requisite state of mind because of involuntary intoxication would somehow "abolish[ ] the State's burden of proving that a defendant possessed the requisite state of mind at the time of the offense." *Supra* ¶ 20 n. 2. A state may preclude a defendant from offering psychological evidence to rebut

---

4. The first sentence of A.R.S. § 13–502(A) now reads:

   A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong.

5. Since statehood and before the 1993 repeal of former § 13–503, Arizona's treatment of voluntary intoxication remained essentially consistent. Compare A.R.S. § 13–503 (1989)

   No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent

to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

with § 22 of the 1913 Penal Code:

   No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.

*mens rea. State v. Mott,* 187 Ariz. 536, 541–42, 931 P.2d 1046, 1051–52 (1997) (citing *Fisher v. United States,* 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946)); *see also Montana v. Egelhoff,* 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (statute barring a defendant from presenting evidence of voluntary intoxication to rebut *mens rea* does not violate due process). The decision by our legislature to treat a temporarily intoxicated person the same as everyone else, except if the intoxication was involuntary and to such a degree that the person was rendered insane, does not relieve the state of its burden to prove the requisite state of mind as an element of the crime. Instead, the majority decision resurrects a *mens rea* "diminished capacity" defense seemingly laid to rest by *Mott,* 187 Ariz. at 541, 931 P.2d at 1051 ("Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime.").

¶ 42 The majority's reliance on A.R.S. § 13–201 (1978) is also misplaced. Before criminal liability may be imposed, § 13–201 requires "the performance by a person of conduct which includes a voluntary act." A voluntary act is "a bodily movement performed consciously and as a result of effort and determination." A.R.S. § 13–105(37) (1994). An unconscious act has been construed as " 'one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional.' " *State v. Venegas,* 137 Ariz. 171, 173, 669 P.2d 604, 606 (App.1983) (quoting *People v. Ray,* 14 Cal.3d 20, 120 Cal.Rptr. 377, 533 P.2d 1017, 1019 (Cal. 1975)).

¶ 43 The majority's analysis confuses § 13–201's requirement of a voluntary act with the condition of being involuntarily intoxicated [6] in arriving at its conclusion that the trial judge violated "a fundamental principle of justice well recognized in Arizona" (*supra* ¶ 20) when he instructed the jury that it could not consider any evidence of defendant's drug use in determining whether he acted intentionally, knowingly, or with premeditation. Therefore, I do not share my colleagues' concern that A.R.S. § 13–503 must be read as permitting an involuntary intoxication defense lest a fundamental tenet of justice be violated. Furthermore, even if defendant was in a state of involuntary intoxication, he cannot plausibly claim that he was not performing a bodily movement "consciously and as a result of effort and determination" when he calculated and carried out his plan—that he had been brooding about for months—to kill his ex-wife and her new husband.

¶ 44 In summary, involuntary intoxication is a defense to a criminal act or requisite state of mind only if the person was insane at the time the act was committed. The defendant did not pursue an insanity defense at trial nor can he plausibly claim that his conduct fell outside the statutory definition of a "voluntary act." Thus, the trial court properly instructed the jury not to consider any evidence of defendant's claimed intoxication in arriving at its verdicts.

---

6. In its sections on intoxication, the Model Penal Code avoids using "voluntary" and "involuntary" because the words "have unfortunate overtones, and are better used in other contexts." MODEL PENAL CODE AND COMMENTARIES § 2.08 cmt. 3 n. 40 (1985).